**Brian CORNFIELD, a minor, By his Mother and next friend, Janet LEWIS, Plaintiff–Appellant,**

v.

**CONSOLIDATED HIGH SCHOOL DISTRICT NO. 230, Richard Spencer, and James Frye, Defendants–Appellees.**

No. 92–1863.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 12, 1992.

Decided April 23, 1993.

Richard L. Hutchison, Hutchison, Anders & Associates, Tinley Park, IL (argued), for plaintiff-appellant.

Robert M. Chemers, Edward B. Ruff (argued), Michael G. Bruton, Pretzel & Stouffer, Chicago, IL for defendants-appellees.

Before FLAUM and EASTERBROOK, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

FLAUM, Circuit Judge.

Brian Cornfield was enrolled in a behavioral disorder program at Carl Sandburg High School. Kathy Stacy, a teacher's aide in that program, found him outside the school building in violation of school rules on March 7, 1991. When she reported the infraction to Richard Spencer, Cornfield's teacher, and Dean Richard Frye, Stacy also alerted them to her suspicion that Cornfield appeared "too well-endowed." Another teacher, Joyce Lawler, and teacher's aide Lori Walsh corroborated Stacy's observation of an unusual bulge in Cornfield's crotch area. Neither defendant took any action at that time. The following day Cornfield was boarding the bus home when Spencer and Frye took him aside. Spencer himself had observed the unusual bulge in the crotch area of Cornfield's sweatpants. Believing the sixteen-year-old Cornfield was "crotching" drugs, Spencer and Frye asked him to accompany them to Frye's office to investigate further. When confronted with their suspicion, Cornfield grew agitated and began yelling obscenities. At Cornfield's request, Frye telephoned the minor's mother Janet Lewis to seek consent for a search. She refused.

Spencer and Frye nevertheless proceeded with the search. Believing a pat down to be excessively intrusive and ineffective at detecting drugs, they escorted Cornfield to the boys' locker room to conduct a strip search. After making certain that no one else was present in the locker room, they locked the door. Spencer then stood about fifteen feet from Cornfield, and Frye was standing on the opposite side, approximately ten to twelve feet away, while they had him remove his street clothes and put on a gym uniform. Spencer and Frye visually inspected his naked body and physically inspected his clothes. Neither man performed a body cavity search. They found no evidence of drugs or any other contraband. Afterwards the school bus was recalled, and it took Cornfield home.

Alleging that the search violated his Fourth, Fifth, and Fourteenth Amendment rights, Cornfield brought an action under 42 U.S.C. § 1983 against Consolidated High School District No. 230 ("District 230"), the parent organization of Carl Sandburg High School, and against Spencer and Frye in their professional and individual capacities.

I.

After the filing of affidavits, the district court granted summary judgment in favor of Spencer and Frye in their individual

capacities, a decision that we review *de novo. Doe v. Allied–Signal, Inc.,* 925 F.2d 1007, 1008 (7th Cir.1991). In examining the record, we draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Lohorn v. Michal,* 913 F.2d 327, 331 (7th Cir.1990). The non-moving party cannot rest on the pleadings alone, but must identify specific facts to establish that there is a genuine triable issue. Unless we find evidence sufficient to sustain a jury ver-lict in favor of the nonmoving party, we will affirm the grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### A.

■■■ The first question we address on review is whether the strip search of Cornfield was consistent with the Fourth Amendment. The Supreme Court established in *New Jersey v. T.L.O.* that reconciling the privacy interests of children with the needs of schools to maintain order does not require strict adherence to a probable cause standard for Fourth Amendment purposes. By its express language, the Fourth Amendment prohibits only unreasonable searches:

> Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires "balancing the need to search against the invasions which the search entails." On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.

469 U.S. 325, 340, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985) (citations omitted). To strike a balance, the Supreme Court fashioned a two-prong test for evaluating whether a search of a student is constitutional. First, the search must be "justified at its inception." *Terry v. Ohio,* 392 U.S.

1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). According to the Supreme Court, "a search of a student by a teacher or other school official is 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.,* 469 U.S. at 341–42, 105 S.Ct. at 743. "Justified at its inception" in the present context does not mean that a school administrator has the right to search a student who merely acts in a way that creates a reasonable suspicion that the student has violated *some* regulation or law. Rather, a search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation. Second, the search must be permissible in scope: "[T]he measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

■■■ Therefore, whether a search is "reasonable" in the constitutional sense will vary according to the context of the search. In this regard, a couple of points should be immediately apparent. A nude search of a student by an administrator or teacher of the opposite sex would obviously violate this standard. Moreover, a highly intrusive search in response to a minor infraction would similarly not comport with the sliding scale advocated by the Supreme Court in *T.L.O.* To elaborate, "[a] search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." *Id.* at 337–38, 105 S.Ct. at 740–41. Accordingly, as we concluded in *Doe v. Renfrow,* 631 F.2d 91 (7th Cir.1980) (per curiam), *cert. denied,* 451 U.S. 1022, 101 S.Ct. 3015, 69 L.Ed.2d 395 (1982), which adopted the opinion of the district court, *Doe v. Renfrow,* 475 F.Supp. 1012 (N.D.Ind.1979), "[s]ubjecting a student to a nude search is more than just the mild inconvenience of a pocket search, rather it is an intrusion into an

individual's basic justifiable expectation of privacy." *Id.* at 1024. Indeed, we amplified this concern: "It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principle of human decency." 631 F.2d at 92–93. Therefore, as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness. What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search.

■■■■ Thus, this flexible standard allows a school administrator or court to weigh the interest of a school in maintaining order against the substantial privacy interests of students in their bodies. In this regard, no one would seriously dispute that a nude search of a child is traumatic. *See, e.g., Darryl H. v. Coler,* 801 F.2d 893, 901 (7th Cir.1986); *Flores v. Meese,* 681 F.Supp. 665, 667 (C.D.Cal.1988); *Bellnier v. Lund,* 438 F.Supp. 47, 53 (N.D.N.Y. 1977). The actual impact of a strip search will, of course, vary with the individual child, which is difficult to predict, and with the child's age, which is not. Although the Supreme Court in *T.L.O.* identified age as one of the factors used to evaluate the reasonableness of a search, it did not elaborate how age mattered. Whether the child is seven or seventeen is nonetheless relevant. *See* Group for the Advancement of Psychiatry, *How Old is Enough?—The Ages of Rights and Responsibilities* (1989); *Children's Competence to Consent,* (Gary B. Melton et al., eds. 1983); *see generally* S. Shatz, M. Donovan, and J. Hong, *The Strip Search of Children and the Fourth Amendment,* 26 U.S.F.L.Rev. 1 (1991); M. Gardner, *Student Privacy in the Wake of T.L.O.: An Appeal for an Individualized Suspicion Requirement for Valid Searches and Seizures in the Schools,* 22

Ga.L.Rev. 897 (1988). First, the likelihood that a child is engaging in independent criminal activity will tend to increase with the age of the child. Second, a child's capacity to meaningfully consent to the strip search decision will depend on the child's age.[1]

Since the ages of seven and fourteen are regarded as important transition periods in child development, they also can serve as useful guideposts for us here. In fact, these same age divisions correspond neatly with assumptions long employed in criminal law. At common law children under the age of seven were considered to be without criminal capacity. Children over the age of fourteen were treated as having the same criminal capacity as adults. And children between the ages of seven and fourteen were presumed to be incapable of committing crimes, although this presumption was rebuttable. In other words, adolescents are generally presumed to be as capable of independent criminal activity as adults. By contrast, elementary school children are far less likely to engage independently in criminal activity, including concealing contraband in private areas. Accordingly, adolescents will generally have the same capacity as adults to understand the issues involved in a strip search, including deciding whether to consent. Because of the presumption regarding elementary school children, we would naturally be much more circumspect about their ability to comprehend the impact of a strip search, or to consent to one. In sum, the legitimate expectations of privacy that students in school may claim are not monolithic.

### B.

■■■ Whether the search of Cornfield comports with the two-prong *T.L.O.* standard requires careful scrutiny of the circumstances surrounding the search. One fact is not in dispute: Cornfield was in a

---

**1.** The impact of the search will also vary with the age of the child. Perhaps counterintuitively, a very young child would suffer a lesser degree of trauma from a nude search than an older child. As children go through puberty, they become more conscious of their bodies and self-conscious about them. Consequently, the potential for a search to cause embarrassment and humiliation increases as children grow older.

behavioral disorder program at the high school. In this regard, Cornfield contends that his problems are exclusively behavioral, which would be too thin a reed to support reasonable suspicion for a strip search: The fact that students in such a program exhibit inconsistent behavior and that drug users behave erratically does not lead inevitably to a conclusion that a student in a behavioral disorder program is a drug user. Spencer and Frye, however, have attested to a number of other independent factors to support the reasonableness of their suspicions of drug possession by Cornfield.

Spencer, one of Cornfield's teachers, had more direct contact with the appellant than Frye and alleged in his affidavit several incidents on which to ground of his suspicions. According to Spencer, Cornfield once stated that prior to December of 1990 he was dealing drugs and that in February 1991, he would test positive for marijuana. Spencer also believed that Cornfield did not successfully complete a drug rehabilitation program in December of 1990. And on January 29, 1991, Cornfield was found in possession of a live bullet at school. The remaining incidents giving rise to Spencer's suspicion occurred at some unspecified time prior to the date of the strip search: Cornfield's bus driver had reported the smell of marijuana from where Cornfield was sitting on the bus, one student reported having observed Cornfield smoking marijuana on one occasion on the bus, another student had advised Spencer of Cornfield's possession of drugs while on school grounds, Cornfield himself had related to Spencer that he was constantly thinking about drugs, and teacher's aide Kathy Stacy had informed Spencer that Cornfield claimed he had "crotched" drugs during a police raid at his mother's house. Spencer also attested to the fact that he had the opportunity to view Cornfield throughout the year; and March 7, 1991 was the first time he had observed the unusual bulge in Cornfield's crotch area.

According to Frye's affidavit, Spencer shared with Frye any information or incidents involving Cornfield. In addition, Palos Park police officer William Jackson communicated to Carl Sandburg's Head Dean Sutor that on October 24, 1990 he had received information that Cornfield was selling marijuana to other students. Head Dean Sutor conveyed this to Frye. Cornfield also acknowledged at some point to Sutor, in the presence of Kathy Stacy, that he failed a urine analysis for cocaine. Sutor advised Spencer and Frye of this as well.

Cornfield argues that Spencer and Frye could not reasonably have formed any manner of belief that he possessed drugs. Except for a couple of these incidents that he either has acknowledged or could not refute, Cornfield maintains the remainder never occurred. Specifically, he denies that he ever crotched drugs, that he smoked marijuana on the bus, that he brought marijuana onto school grounds, that he stated he would test positive for marijuana, that he had failed a cocaine test, and that he acknowledged to Spencer or anyone else he constantly thought about drugs. Furthermore, Cornfield's mother asserts in her affidavit that Cornfield left the drug rehab program because he was found "inappropriate." The program concluded that he had attention deficit disorder, not a drug problem. His mother also contends that he was not even on the bus the day the driver smelled marijuana.

In denying that any of these incidents occurred, Cornfield is effectively arguing that it would be unreasonable to form a suspicion on the stated grounds. That is, neither Spencer nor Frye could have received a significant portion of the information on which they relied because those events never occurred. According to Cornfield's affidavits, the only undisputed facts prior to the events leading up to the strip search were Officer Jackson's report, a single tip by another student, and Cornfield's possession of a live bullet. He contends that these three incidents, along with the perceptions of Spencer and Frye on the day of the strip search, are not sufficient to create a reasonable suspicion. However, several teachers and aides corroborated their suspicion of an unusual bulge in Cornfield's crotch area. More importantly,

some of the statements on which Spencer and Frye apparently relied were from third parties, not Cornfield. Cornfield has not established that these statements, even if untrue, were not made or that Spencer and Frye could not reasonably believe them to be true.

To overcome the district court's grant of summary judgment, Cornfield would need to establish a genuine issue of material fact. Because we are faced with a number of incidents that allegedly served as a foundation for reasonable suspicion, whether individual incidents actually occurred is material only if the total number of undisputed or uncontroverted facts are not sufficient to form a reasonable suspicion. Thus, while we assume for purposes of summary judgment that Spencer and Frye did not rely on direct statements from Cornfield that Cornfield denies having made, they nonetheless considered more than the three wholly uncontested factors to form their suspicion.

Cornfield's case does differ from other student search cases in that Spencer and Frye based their decision on evidence or events that had occurred over some period of time. *Cf. Williams by Williams v. Ellington*, 936 F.2d 881 (6th Cir.1991) (events giving rise to reasonable suspicion for partial strip search occurred in same week). This aspect of the case evokes some concern because school teachers and administrators can marshal negative incidents and perceptions while discounting any contrary evidence that may accumulate over the course of a number of months, or longer.[2] As the facts of this case stand, however, Spencer and Frye relied on a number of relatively recent incidents reported by various teachers and aides as well as their personal observations, the cumulative effect of which is sufficient to create a rea-

sonable suspicion that Cornfield was crotching drugs.

The second prong of our inquiry concerns whether the search was permissible in scope. On the one hand, the sixteen-year-old Cornfield was of an age at which children are extremely self-conscious about their bodies; thus, the potential impact of a strip search was substantial. However, given Spencer and Frye's suspicion that Cornfield was crotching drugs, their conclusion that a strip search was the least intrusive way to confirm or deny their suspicions was not unreasonable. As administered, two male school personnel performed the search and did so in the privacy of the boys' locker room. Cornfield contends that other students could have seen him although he does not say that anyone actually did. As Cornfield changed, Spencer and Frye observed from a certain distance away to ensure Cornfield could not conceal any drugs or other contraband he was suspected of carrying. In addition, Spencer and Frye did not physically touch him or subject him to a body cavity search, nor did they have him suffer the indignity of standing naked before them but allowed him to put on a gym uniform while they searched his street clothes. Finally, the fact that Spencer and Frye found no drugs or other contraband does not allow us to conclude retrospectively that the search was unreasonable in scope.

## C.

Spencer and Frye also requested summary judgment on the grounds that they are entitled to qualified immunity. "Under the doctrine of qualified immunity, public officials performing discretionary functions are protected against suits from damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have

---

**2.** Certainly, the lack of communication between Cornfield's parents and his teachers has complicated his cause. If the diagnosis of his behavioral difficulties was attention deficit disorder, for example, his mother never conveyed this to the school authorities. According to their affidavits, Spencer and Frye were under the impression that Cornfield had not successfully completed the drug rehab program. A teacher or school administrator apprised of the fact that a student suffers from attention deficit disorder and is on medication would certainly react differently to erratic behavior by that student. Communication may be even more important with respect to students with learning disabilities, who may be particularly vulnerable to biases and misperceptions because of their condition.

known." *Doe v. Bobbitt*, 881 F.2d 510, 511 (7th Cir.1989) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Furthermore, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986). To determine whether the law was clearly established at the time of the alleged violation, we ask "whether the law was clear in relation to the specific facts confronting the public official when he or she acted." *Green v. Carlson*, 826 F.2d 647, 649 (7th Cir.1987); *accord Powers v. Lightner*, 820 F.2d 818, 821 (7th Cir.1987), *cert. denied*, 484 U.S. 1078, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988).

Cornfield, who bears the burden of establishing the particularized right, points to our decision in *Doe v. Renfrow*, 631 F.2d 91 (7th Cir.1980), as proof of the unconstitutionality of strip searches of students. Actually, our sharp condemnation of the conduct of the school officials in that case stemmed from the fact that the strip search of Doe was executed without any individualized suspicion and without reasonable cause. *Id.* at 92–93. *Renfrow*'s requirement of reasonable cause for searching students is in fact consistent with the standard subsequently enunciated in *T.L.O.* In addition, we have found defendants' conduct to be reasonable under the circumstances. Because Cornfield has not succeeded in placing the actions taken by Spencer and Frye outside a "clearly established" constitutional norm, they are entitled to qualified immunity.

## II.

In the other count of his complaint, Cornfield alleges that Spencer and Frye were implementing a policy of District 230 which endorsed strip searches of students suspected of carrying drugs or other contraband. Because Cornfield is appealing from the district court's grant of a motion to dismiss, we accept as true Cornfield's well-pleaded factual allegations and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to him. *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985).

### A.

■ Under *Monell v. Dept. of Social Services of New York*, municipalities, including school boards, may not be held liable under section 1983 simply because they employed the tortfeasor acting within the scope of his or her employment. Rather, municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. 658, at 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). Furthermore, plaintiffs cannot claim municipal liability unless they can demonstrate that the enforcement of its policy was the "moving force" behind the constitutional violation. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality opinion) ("At the very least, there must be an affirmative link between the policy and the particular constitutional violation alleged."). In order to establish the existence of a policy, a plaintiff may look to: the official pronouncements of municipal or legislative bodies, agency action in accordance with delegated authority, actions by individuals with final decisionmaking authority, inaction or custom.

■ Because Cornfield has not identified any specific guidelines enacted by the state or District 230 governing searches of students, he can argue only individual action or inaction. To carry the day on the former claim, Cornfield would need to establish that Dean Frye had final decisionmaking authority. Only those officials who possess the requisite policymaking authority are capable of establishing "official policy" within the meaning of *Monell*. *Pembaur v. Cincinnati* recognized that under the appropriate circumstances, "municipal liability may be imposed for a single

decision by municipal policymakers." 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (plurality opinion). Moreover, hierarchy is not necessarily dispositive of the issue inasmuch as municipal liability may be predicated upon the act of even a low-level subordinate who has been delegated final authority in a limited area, while a high-level official's order may not be actionable unless he or she possesses final decisionmaking authority with respect to that particular area. *Id.* at 483, 106 S.Ct. at 1300.

 Of course, identifying those vested with the authority to make policy is no mean feat. The exercise of discretion by a particular official, standing alone, does not give rise to municipal liability. Municipal liability should attach only if the unconstitutional decision was "a deliberate choice to follow a course of action" and if state or local law authorized the decisionmaker "responsible for establishing final government policy with respect to the subject matter in question." *Pembaur,* 475 U.S. at 483–84, 106 S.Ct. at 1300. More recently, the Supreme Court has confirmed that "final policymaking authority" is a question of state law. *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (citing *Pembauer,* 475 U.S. at 483, 106 S.Ct. at 1300). State and local law, as well as " 'custom and usage' having the force of law," *St. Louis v. Praptnik,* 485 U.S. 112, 124 n. 1, 108 S.Ct. 915, 924 n. 1, 99 L.Ed.2d 107 (1988), may illustrate which officials or governmental entities are endowed with final policymaking authority with regard to the action that allegedly caused the particular constitutional or statutory violation. *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723. However, to say that a court must look to

state law to determine who has final policymaking authority does little to reveal how a court evaluates the actions of a municipal employee or agent. Certainly someone with executive authority whose actions fly in the face of state or local law is not a policymaker under *Monell* and its progeny. *See Auriemma v. Rice,* 957 F.2d 397, 401 (7th Cir.1992). However, exercise of executive authority—as opposed to legislative authority—is not necessarily inconsistent with policymaking. *See, e.g., Pembaur,* 475 U.S. at 481–84, 106 S.Ct. at 1299–1300.

 Appellants argue that the question of Dean Frye's authority to set policy begins and ends with Ill.Rev.Stat. ch. 122 ¶ 10–20.5.[3] Not exactly. This provision only elaborates a school board's authority to adopt rules; it does not answer the question of whether the state or a given school board has delegated authority to individual deans to handle disciplinary matters as sensitive as searches of students. Arguably, such a practice of committing everything to the discretion of a subordinate could result in the actions of the subordinate, however conducted, being municipal policy as long as that official is acting within the scope of his or her employment. On the other hand, the absence of a written policy is not enough to support an inference that final policymaking authority has been delegated to a subordinate. But there are other indications of a policy concerning the searches of students. For example, the next paragraph of the Illinois School Code vests school principals with the responsibility "to utilize the resources of proper law enforcement agencies when the safety and welfare of students and teachers are threatened by the illegal use of drugs and alcohol." Ill.Rev. Stat. ch. 122 ¶ 10–21.4(a).[4] Does this mean

---

3. The provision reads:
 Rules. To adopt and enforce all necessary rules for the management and government of the public schools of their district. Rules adopted by the school board shall be filed for public inspection in the administrative office of the district.
 Ill.Rev.Stat. ch. 122 ¶ 10–20.5.

4. The School Code in fact recognizes the possible necessity of inspections for drugs:

School boards are empowered to adopt a policy to authorize school officials to request the assistance of law enforcement officials for the purpose of conducting reasonable searches of school grounds and lockers for illegal drugs, including searches conducted through the use of specially trained dogs.
Ill.Rev.Stat. ch. 122 ¶ 10–22.10a.

that there is a policy which obliges school administrators to seek police assistance in conducting searches? That the School Code has sanctioned policymaking only for searches of school grounds and school lockers, leaving school officials to their instincts in any other circumstance? The answer to either question is no. Nothing in the School Code allows us to infer that a disciplinary dean has been delegated policymaking authority. Furthermore, because neither side has brought any District 230 policy for the conduct of searches to our attention, we assume that one does not exist.

Of course, the absence of a written policy does not wholly exempt a municipality from liability. Such an approach would create a perverse incentive for school boards to adopt a policy of not having defined or written policies, the effect of which would be to immunize the municipalities from liability for unconstitutional actions by their agents. The risk is that a municipality will bury its head in the sand rather than acknowledge and attempt to remedy unconstitutional conduct by its employees. Accordingly, in situations that call for procedures, rules, or regulations, the failure to make a policy itself may be actionable. *Avery v. County of Burke,* 660 F.2d 111, 114 (4th Cir.1981); *Murray v. City of Chicago,* 634 F.2d 365, 366–67 (7th Cir.1980). In other words, a practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability. In this regard, a single isolated incident of wrongdoing by a nonpolicymaker is generally insufficient to establish municipal acquiescence in unconstitutional conduct. *See Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436; *Jones v. City of Chicago,* 787 F.2d 200, 204 (7th Cir.1986); *cf. Strauss v. City of Chicago,* 760 F.2d 765, 769 (omission may be "sufficiently egregious that plaintiff's injury alone suggest[s] an established policy").

We have held that an allegation of a pattern or a series of incidents of unconstitutional conduct is required to withstand a motion to dismiss for a failure to make policy. *Powe v. City of Chicago,* 664 F.2d 639, 650 (7th Cir.1981); *accord Jones,* 787 F.2d at 204 (requiring "systemic" faulty inaction). In other words, enduring practices of officials or their employees may create liability. Cornfield, however, does not allege that there is a widespread practice of nonconsensual and unconstitutional searches of students in District 230 that would support a conclusion of municipal liability. Rather, his position is that District 230 should be held liable on account of this and one alleged previous strip search at Carl Sandburg High School as well as a subsequent endorsement by District 230 school board president of strip searches of students conducted with parental consent.

According to the plurality in *Prapotnik,* "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." 485 U.S. at 127, 108 S.Ct. at 926. In the pleadings, Cornfield alleged that after he was searched, District 230 President John Novosel publicly supported strip searches by District 230 personnel provided that parental consent is secured. Assuming, *arguendo,* that Novosel was speaking for District 230, his subsequent endorsement of the conduct would be equivalent to authorization of the act. One significant obstacle to this argument is that we do not know what specific policy Novosel had in mind. Arguably, the endorsement or ex post authorization could create liability for any unconstitutional searches. Moreover, if Novosel intended to support strip searches by District 230 personnel without regard for the constraints imposed by *T.L.O.,* then the policy itself would be unconstitutional. (In this regard, parental consent would be relevant principally in answering the question of whether District 230 personnel acted consistently with District 230 policy.) Having only the pleadings to go on, we could spin out endless hypothetical policies. This only suggests that Cornfield has not stated a claim from which we could conclude that the alleged custom or policy of inaction exists. *See Strauss,* 760 F.2d at 767.

### B.

■ Cornfield also contends that District 230 is liable for having a policy or custom of failing to develop administrative policies or to afford training for the detection and investigation of contraband on school premises. An allegation of a "failure to train" is available only in limited circumstances. To prevail, Cornfield must show that District 230's "failure to train its employees in a relevant respect evidences a 'deliberate indifference'" to the rights of students. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Deliberate indifference itself is an elusive standard. The Supreme Court reasoned that policymakers would be deliberately indifferent when "in light of the duties assigned to the specific ... employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." *Id.* In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or training program, we require a high degree of culpability on the part of the policymaker. Coupled with a causation requirement, this standard ensures that the violation alleged is not too far removed from the policy or training challenged as inadequate. Taken together, these two considerations amount to a requirement that liability be based on a finding that the policymakers have actual or constructive notice that a particular omission that is likely to result in constitutional violations. Otherwise, we would risk creating *de facto respondeat superior* liability, which is contrary to *Monell*. *See Monell*, 436 U.S. at 693–94, 98 S.Ct. at 2037–38.

■ Accordingly, it may be that a municipality could fail to train its employees with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. *See City of Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10. Given the nebulous

standards governing student searches, school districts and school district administrators cannot be held accountable on this ground because the particular constitutional duty at issue is not clear. Alternately, municipal liability would be proper for a failure to train when the need is not necessarily obvious from the outset, but the pattern or frequency of constitutional violations would put the municipality on notice that its employees' responses to a recurring situation are insufficient to protect constitutional rights involved. *Id.* In other words, the policymakers had acquiesced in a pattern of constitutional violations.

■ Unlike a municipal custom or a policy of inaction, establishing a failure to train as a form of municipal action requires something more in order to rise to the level of deliberate indifference. Cornfield has not stated a claim that establishes deliberate indifference by District 230. The two reported incidents of strip searching at Carl Sandburg, even in conjunction with Novosel's statement, fall short of a pattern of violations sufficient to put the school board on notice of potential harm to students. Nothing in the record before us is sufficient to show deliberate indifference on the part of District 230 in failing to develop and implement policies and procedures for handling student searches.[5]

One concern nevertheless remains: a school board may attempt to shield itself from liability by creating a buffer of non-policymaking employees who lack both training and accountability to the school board. Given the proliferation of drugs and weapons in schools, both urban and non-urban, it is remarkable that neither the Illinois State Board of Education nor District 230 has responded. Although specific circumstances will vary, our analysis here details various factors critical to evaluating the necessity and scope of search that may be warranted. Of course, no school searches can be administered without reasonable suspicion; and clearly, a highly

---

5. Numerous school boards, however, have decided otherwise. *See* F. Delon & G. Gettings, *The Post*-T.L.O. *Status of Search and Seizure Policies and Practices in Public Schools*, 45 Ed.

Law Rep. 461 (1988); *see, e.g.,* Okla.Stat.Ann. tit. 70, § 24–102 (1988) (requiring school boards to adopt policies for conducting student searches).

intrusive search necessarily requires more compelling evidence to reach the floor of reasonableness, as this case reflects. This determination is inevitably committed to the sound discretion of school personnel. Adopting regulations for conducting searches would not necessarily create or expand the authority of these school personnel but instead provide meaningful notice to students and their parents.

For the foregoing reasons, the decision of the district court is AFFIRMED.

EASTERBROOK, Circuit Judge, concurring.

Parts I.A and I.B of the court's opinion show convincingly that defendants Spencer and Frye did not violate Cornfield's rights. I join these portions of the opinion. The discussions of qualified immunity and municipal liability in Parts I.C and II are unnecessary, and I do not join them. Because Spencer and Frye did no wrong this case is over, and the opinion should end with that conclusion.

Spencer and Frye presented a defense of qualified immunity because they wanted to avoid paying damages were we to agree with Cornfield on the merits. Cornfield argued that Spencer and Frye were following or had set a municipal "policy" because he wanted a deep pocket from which to collect damages were we to hold the search unconstitutional. Both of these subjects lose their significance once we conclude, as we have, that the individual defendants respected Cornfield's constitutional rights. Having made the litigants' contentions irrelevant, we should withhold comment. Our views about these subjects are advisory—pertinent to some other case, perhaps, but inconsequential to this one. That the parties have mooted a subject that turns out to be irrelevant is neither reason nor authority for judicial exegesis on the matter.