**ESTATE OF Hersey L. BRYANT, Jr. by its administratrix, Mattie BRYANT, et al., Plaintiffs,**

v.

**Ralph J. BUCHANAN, Joseph C. Gambrall, George Leon Benjamin, David Washington, and Rizwan S. Khan, in their individual capacities as police officers for the City of Indianapolis, and the City of Indianapolis, Defendants.**

No. IP 93–1049 C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

April 27, 1995.

Stephen Pierson, Pierson & Hamilton, Indianapolis, IN, for plaintiffs.

Frederick A. Roetter, John C. Ruckleshaus, Ruckleshaus Roland Hasbrook & O'Connor, Indianapolis, IN, for defendants.

BARKER, Chief Judge.

This matter is before the Court on the defendants' motion for summary judgment. For the reasons stated below, the motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

This is a § 1983 suit against several Indianapolis Police Department ("IPD") officers and the City of Indianapolis for the death of Hersey Bryant. On August 9, 1992, Mr. Bryant disrupted a downtown church during Sunday worship. Among other things, Bryant was yelling at demons in the church and anointing church deacons with olive oil. Although it is not clear whether Bryant posed a physical threat to the congregation, it is undisputed that someone called "911" and the police arrived soon thereafter.

Defendant officers Buchanan and Khan were the first to arrive at the church. They found several parishioners surrounding Bryant, who was located under a pew. Although unable to subdue Bryant, the officers succeeded in cuffing Bryant's ankles. Officers Gambrall, Benjamin and Washington arrived soon thereafter and joined the fray. Their attempts to cuff Bryant and remove him from the church, however, proved fruitless. Bryant squirmed, wriggled and writhed under the pews as an "incomprehensible, quasi-religious babble" emanated from his mouth. (Plaintiffs' Memorandum in Opposition, p. 6).

At some point after Bryant's ankles were cuffed, but before he was completely subdued, one or two of the officers sprayed Bryant in the facial area with "CS spray," a substance related to tear gas. The amount sprayed is in dispute. Shortly thereafter, Bryant lost consciousness. IPD officers then rolled him onto his stomach, cuffed his hands behind his back and placed their knees and weight on his chest. At one point Officer Khan, concerned about how quiet Bryant had become, checked Bryant's pulse. After finding a pulse, however, the officers continued to hold Bryant down with their knees until

an ambulance arrived. Before reaching the hospital, Bryant died of asphyxiation.

On August 11, 1993, Mattie Bryant filed the present suit as the Administratrix of Hersey Bryant's estate. In the Amended Complaint filed November 16, 1993, Plaintiff alleges that the individual officer defendants used excessive force in effecting the arrest of her husband. She also alleges that IPD's official policies concerning the use of CS gas are unconstitutional. On December 15, 1994, Defendants filed their motion for summary judgment, arguing that the individual officers are entitled to qualified immunity and that IPD's policy regarding the use of CS gas did not cause the alleged constitutional deprivation. Both of these arguments will be discussed in turn.

## II. STANDARD OF REVIEW

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The court must view all inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Estate of Starks v. Enyart*, 5 F.3d 230, 232 (7th Cir.1993).

## III. QUALIFIED IMMUNITY

■ Police officers who use force in making an arrest are entitled to qualified immunity from suits for damages under 42 U.S.C. § 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Rice v. Burks*, 999 F.2d

1172, 1174 (7th Cir.1993).[1] Once a defendant has raised a qualified immunity defense, courts must employ a two-step analysis: (1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question? *Burns v. Reed,* 44 F.3d 524, 526–27 (7th Cir.1995); *Kernats,* 35 F.3d at 1176. Failure on either prong will defeat the attempt to overcome immunity. *Burns,* 44 F.3d at 527.

## A. Did Plaintiff Allege a Constitutional Violation?

■ Plaintiff alleges that the forced used by the individual IPD officers was excessive and constituted an unreasonable seizure of Bryant in violation of the Fourth Amendment.[2] Specifically, Plaintiff maintains that by spraying Bryant with large amounts of CS gas, rolling him onto his stomach, handcuffing him behind his back and pressing their knees into his chest in such a manner as to cause unconsciousness and death, the officers employed excessive force. Because issues of material fact exist as to the reasonableness of the force used to secure Bryant's arrest, we find that Plaintiff has alleged a constitutional violation.

■ Excessive force claims relating to an arrest or other seizure must be analyzed under an objective reasonableness standard. *Jones v. Webb,* 45 F.3d 178, 183 (7th Cir. 1995). An officer's actions must be objectively reasonable "in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Factors relevant to this inquiry include "the severity of the crime at issue, whether the suspect poses an immediate threat to the

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. The Court must allow for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872; *Jones,* 45 F.3d at 183.

At least one circuit court has recently held that the use of a chemical agent to secure the arrest of an individual for a minor violation can constitute excessive force. For example, in *Adams v. Metiva,* 31 F.3d 375 (6th Cir. 1994), the Sixth Circuit considered whether an officer who twice sprayed mace on an individual suspected of violating the state's seat belt law used excessive force. In denying the defendant officer's motion for summary judgment, the court noted that factual issues remained concerning whether the plaintiff was resisting arrest. Nevertheless, the court concluded: "if the jury determines that plaintiff's version of events is true, this action would constitute excessive force as a matter of law." *Id.* at 386.

■ In this case, when viewed in the light most favorable to Plaintiff, a reasonable factfinder could find that the defendant officers employed excessive force to secure Bryant's arrest. Significantly, Bryant's alleged misconduct was neither violent nor serious. There is evidence to suggest that Bryant did not pose a physical threat to either the IPD officers or members of the congregation, or that his behavior constituted anything more serious than disorderly conduct, a class B misdemeanor under Indiana law. I.C. § 35–45–1–3. Thus, this is not a case where the

---

1. As this Circuit has recently stated:

 Since *Harlow,* courts have employed an objective test for determining whether public official defendants are entitled to qualified immunity. The objective standard protects the public interest in deterrence of and compensation for an official's unlawful conduct while safeguarding the official's ability to make difficult decisions "with independence and without fear of consequences."

 *Kernats v. O'Sullivan,* 35 F.3d 1171, 1176 (7th Cir.1994) (citations omitted).

2. The Fourth Amendment provides:

 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

 U.S. Const.Amend. 4.

officers were forced to make split-second judgments under tense and rapidly evolving circumstances involving grave danger. Moreover, Plaintiff submits evidence tending to show (1) that Bryant was already cuffed and subdued when two officers sprayed him in the mouth with CS gas, (2) that the officers continuously sprayed Bryant until he went limp, his eyes rolled back in his head and foam bubbled out of his nose and mouth,[3] and (3) that once subdued, the officers rolled Bryant onto his stomach and exerted heavy pressure on his back with their knees despite his unconsciousness and apparent difficulty in breathing.[4] Plaintiff also submits an expert opinion maintaining that Bryant's death was caused by the forceful "compression of his chest by the officers sitting on him." (Aff. Donald T. Reay, M.D., p. 2). Thus, the evidence suggests that the danger was minimal and the force applied extreme. Accordingly, we find that Plaintiff has identified sufficient factual issues to support an excessive force claim.

### B. Were the Constitutional Standards Clearly Established?

Plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *Kernats*, 35 F.3d at 1176. The right allegedly violated must be clearly established in a particularized sense: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). This is not to say, however, that a plaintiff must direct the court to a case that is "precisely on all fours on the facts and law involved here." *Kernats*, 35 F.3d at 1176 *quoting Landstrom v. Illinois Dep't of Children and Family Servs.*, 892 F.2d 670, 676 (7th Cir.1990). Rather, there need only be a "closely analogous case" establishing that

Bryant "had a constitutional right to be free from the type of force the police officers used on him." *Rice*, 999 F.2d at 1174. Nevertheless, this is "a rather heavy burden, and appropriately so because qualified immunity is designed to shield from civil immunity all but the plainly incompetent or those who knowingly violate the law." *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir.1994) (quotation marks omitted) (citations omitted).

■ In this case, Plaintiff cites three cases for the proposition that it was clearly established law in August, 1992, that the Fourth Amendment proscribes the use of excessive force. "Our inquiry here, however, requires a higher level of specificity." *Jones*, 45 F.3d at 184.[5] Rather, Plaintiff must point to a case that puts officers on notice that they should avoid spraying a resisting suspect with mace and then placing pressure on his chest so as to prevent normal respiration and cause death. Not surprisingly, given these unique facts, the Court has been unable to identify such a case. Indeed, of the few cases considering the reasonableness of the use of mace or tear gas by law enforcement officials on or before August, 1992, most have held that it did not constitute excessive force where necessary to control a resisting arrestee or prisoner. *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir.1984) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary" does not violate Eighth Amendment); *Smith v. Iron County*, 692 F.2d 685 (10th Cir.1982) (use of mace on a pre-trial detainee in prison cell after warnings did not violate constitutional due process); *United Steelworkers of America v. Milstead*, 705 F.Supp. 1426 (D.Ariz. 1988) (use of tear gas to effect arrest was not contrary to the reasonableness requirement of the Fourth Amendment); *Dayton v. Sapp*, 668 F.Supp. 385 (D.Del.1987) (use of mace on arrestee not so excessive as to shock the conscience).[6] Thus, although plaintiffs' alle-

---

3. *See, e.g.,* Deposition of Larry Flake, pp. 151–155.

4. Indeed, Officer Khan was concerned enough about Bryant's condition to check his pulse.

5. "In order for the plaintiff to prevail, it is not enough to recite a well-known constitutional principle and state that the actions taken by the

officer violated that principle." *Maltby v. Winston*, 36 F.3d 548, 554 (7th Cir.1994).

6. *But see Lester v. City of Rosedale*, 757 F.Supp. 741, 746 (N.D.Miss.1991) (factual issue existed as to whether the use of mace was "clearly excessive to the need").

gations raise a genuine issue of material fact as to whether the use of CS spray in conjunction with the compression of Bryant's chest was reasonable under the circumstances, Plaintiff has failed to show that clearly established law at the time of the incident declared such actions unconstitutional.

Plaintiff can evade the application of qualified immunity without identifying a closely analogous case, however, if the "force used was so plainly excessive that the police officers should have been on notice that they were violating the Fourth Amendment." *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993); *see also Kernats*, 35 F.3d at 1176. Indeed,

> The easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune ... because no previous case had found liability in those circumstances.

*K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir.1990). For example, in *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir.1992), the Seventh Circuit considered whether a police officer who held a gun to the head of a 9–year old boy and threatened to pull the trigger was entitled to qualified immunity. Although no closely analogous case existed, the court held that the officer was not entitled to immunity because "[i]t should have been obvious ... that his threat of deadly force ... was objectively unreasonable given the alleged absence of any danger." *Id.*

■■■ When read in a light favorable to the Plaintiff, the evidence in this case suggests that the officers' conduct was patently violative of the Fourth Amendment. For example, although Bryant's legs had been shackled and he posed no physical threat to either the police or the congregation, the officers sprayed large amounts of CS gas into Bryant's face. Ultimately, the spray caused Bryant to lose consciousness as a spit-like

foam bubbled out of his nose and mouth. Despite Bryant's apparent difficulty in breathing and the fact that CS fumes were impairing the breathing of some of the arresting officers,[7] however, the officers rolled Bryant onto his stomach, cuffed his hands behind his chest and exerted enough pressure on his back with their knees to cause his death. In short, given the alleged absence of danger, it should have been obvious that the officers' use of deadly force was objectively unreasonable. Thus, because the "legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir.1994), we deny Defendants' motion for qualified immunity. *See Pray v. City of Sandusky*, 49 F.3d 1154, 1160–61 (6th Cir.1995) ("summary judgment is not appropriate if there are factual disputes involving an issue on which the question of immunity turns 'such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights' "); *Estate of Starks v. Enyart*, 5 F.3d 230, 234–35 (7th Cir.1993).[8]

### III. MUNICIPAL LIABILITY

■■■ Defendants next seek dismissal of Plaintiff's municipal liability claim against the City. It is now well settled that liability under § 1983 may not be imposed against a municipal entity under a theory of *respondeat superior*. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, —— U.S. ——, ——, 113 S.Ct. 1160, 1162, 122 L.Ed.2d 517 (1993). Rather, recovery from a municipal entity is "limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). In other words, liability attaches only

---

7. Indeed, at least one officer testified in a deposition that he sought emergency medical attention from ambulance personnel upon their arrival.

8. The Court notes, however, that should this case proceed to trial, the jury will not decide the

qualified immunity issue: "the issue of qualified immunity is a legal question for the trial court, not the jury." *Maltby*, 36 F.3d at 554 (footnote omitted).

when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dept. of Social Services of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

 In order to establish the existence of a policy, a plaintiff may look to official pronouncements of municipal bodies, written guidelines or actions by individuals with final decisionmaking authority. *Pembaur,* 475 U.S. at 480–81, 106 S.Ct. at 1298–99. Of course, the absence of a formal policy does not exempt a municipality from liability:

> Such an approach would create a perverse incentive for [police departments] to adopt a policy of not having defined or written policies, the effect of which would be to immunize the municipalities from liability for unconstitutional actions by their agents. The risk is that a municipality will bury its head in the sand rather than acknowledge and attempt to remedy unconstitutional conduct by its employees.

*Cornfield v. Consolidated School Dist. No. 230,* 991 F.2d 1316, 1326 (7th Cir.1993). In the absence of formal policies, *Monell* and its progeny therefore authorize the imposition of municipal liability "for constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval the body's official decisionmaking channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2036. In other words, "in situations that call for procedures, rules, or regulations, the failure to make a policy itself may be actionable." *Cornfield,* 991 F.2d at 1326.

 In this case, Plaintiff is "challenging the constitutionality of the Indianapolis Police Department's written orders and other training policies, written or not, that concern the use of CS gas." (Court's Memorandum Entry, July 20, 1994) (footnote omitted). IPD's written policy regarding the use of CS gas was established October 22, 1986, in General Order 30.01, which states:

> The CS Repellent may be used as follows:
> 1. When appropriate to subdue or restrain an individual who is resisting arrest.
> 2. When appropriate to subdue or restrain any person so as to prevent injury, harm, or potential harm to the officer or others.
> 3. When appropriate to subdue or restrain any animal so as to prevent injury, harm, or potential harm to the officer or others.

(Defendants' Motion for Summary Judgment, Exhibit A). General Order 18.05 establishes when it is "appropriate to subdue or restrain" a suspect: "A law enforcement officer is justified in using reasonable force [including the use of a chemical agent] if he reasonably believes that the force is necessary to effect a lawful arrest." (Def. Motion for Summary Judgment, Ex. B). Once a chemical agent is used, the officer must then take certain precautions:

> When CS Repellent is used, the following procedures shall be in effect:
>
> \* \* \* \* \* \*
>
> C. Any arrested person on whom the CS Repellent was used shall be sent to Wishard Hospital for examination. In addition, Jail personnel shall be advised of the usage.

(Def. Motion for Summary Judgment, Ex. A).

In light of this language, we cannot say that IPD's CS policy is unconstitutional. The Court concedes that this policy authorizes the use of chemical agents whose use in some circumstances may be unreasonable. *See Adams v. Metiva,* 31 F.3d 375 (6th Cir. 1994) (holding that under plaintiff's version of facts, use of mace by police officer would be excessive). However, General Order 18.05 limits the use of such force in language that parallels the Supreme Court's language in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443.[9] In other words, the

---

9. In *Graham,* the Supreme Court held that in determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment, "the question is whether the officers' actions are 'objectively reasonable' in light

City's formal policy on the use of CS spray simply requires officers to conform to the limitations of the Constitution. As a result, "we cannot say the [the defendant officers] acted pursuant to an unconstitutional policy." *Donovan,* 17 F.3d at 954 (footnote omitted); *see also Graham v. Sauk Prairie Police Commission,* 915 F.2d 1085, 1100 (7th Cir. 1990).

There are limited circumstances, however, under which a municipality can be liable for violations committed by non-policymakers pursuant to a facially constitutional policy. For example, in *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), the Court rejected the contention that a municipality can be held liable under § 1983 only if a municipal policy is itself unconstitutional. In order to avoid creating de facto *respondeat superior* liability, however, the Court required that the plaintiff show more than a single incident of misconduct:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.... *But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*Tuttle,* 471 U.S. at 824–25, 105 S.Ct. at 2436 (emphasis added).

■ Moreover, in *City of Canton v. Harris,* 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989), the Court created a stringent mental state requirement for claims involving a "concededly valid policy [that] is unconstitutionally applied by" an inadequately trained employee. According to the Court, a plaintiff must show the City's "failure to train its employees in a relevant respect evidences a 'deliberate indifference'" to the rights of citizens. *Harris,* 489 U.S. at 389, 109 S.Ct. at 1205. The Court reasoned that municipalities would be liable when

> in light of the duties assigned to the specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Harris,* 489 U.S. at 390, 109 S.Ct. at 1207. Alternately, municipal liability would attach when the "police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to" policymakers deliberately indifferent to the need. *Harris,* 489 U.S. at 390 n. 10, 109 S.Ct. at 1205 n. 10; *see also Cornfield,* 991 F.2d at 1327.[10]

A recent application of these principles in this circuit occurred in *Donovan v. City of Milwaukee,* 17 F.3d 944 (7th Cir.1994). In that case, the court considered whether a municipality should be liable for its written policy authorizing, "as a last resort, the deliberate striking of pursued vehicles and the use of stationary barricades." *Id.* at 954. Specifically, the plaintiff claimed that the policy was inadequate because it did not list the safety of the pursued driver as a relevant factor when deciding whether to terminate a high speed chase.

In holding for the defendant, however, the court observed that the plaintiff's claim fell short on two separate grounds. First, the plaintiff submitted no evidence of additional incidents where "the [city's] failure to supplement its high speed chase policy with an

of the facts and circumstances confronting them." 490 U.S. at 397, 109 S.Ct. at 1872.

**10.** Since *Harris,* Courts have addressed "inadequate policy" cases and "inadequate training" cases as analytically identical. *Graham,* 915 F.2d at 1100 (deliberate indifference standard applied to claim of inadequate background investigation); *Gibson v. City of Chicago,* 910 F.2d 1510, 1522 (7th Cir.1990) (applying deliberate indifference standard to claims of inadequate supervision); *Davis v. City of Ellensburg,* 869 F.2d 1230, 1235 (9th Cir.1989) (same); *Doe v. Calumet City,* 754 F.Sup. 1211, 1222 (N.D.Ill. 1990) ("the analyses under either an 'inadequacy of policy' or a 'failure to train' theory are identical").

exhortation to consider the safety of fleeing drivers and their passengers has led to frequent constitutional violations." *Id.* at 956. Thus, there was no pattern sufficient to put the city on notice of potential harm to the fleeing drivers. Second, the court explained that the City's policy was not so inadequate as to rise to the level of deliberate indifference:

> [Plaintiff] contests the adequacy of the City's policy, not its absence altogether. Indeed, the record shows that City [sic] has promulgated fairly extensive policy on the use of deadly force as well as on proper procedures for ... [the] deliberate striking of vehicles. The mere fact that the City has not included an explicit reference to the safety and well-being of the pursued driver among its "examples of items to be considered" when deciding whether to terminate a chase cannot rise to the level of "deliberate indifference."

*Id.* at 955. The court therefore concluded that the City's general policy regarding the use of force "more than adequately inform[ed] Milwaukee police officers of their role in discharging that duty." *Id.*

■ As in *Donovan*, Plaintiff's challenge in this case fails for two reasons. First, as required by *Tuttle*, Plaintiff has submitted no evidence of additional incidents where the use of CS spray has contributed to the death or injury of arrestees. Without such evidence of a pattern of unconstitutional actions, we simply cannot say that municipal policymakers had "actual or constructive notice" that the use of CS spray to subdue arrestees was likely to result in constitutional violations. *Cornfield*, 991 F.2d at 1327.

■ Nor do we believe a jury could reasonably conclude that the need for more training with regard to the use of CS spray was so obvious and the inadequacy so likely to result in constitutional deprivations that the defendants were deliberately indifferent to the safety of Indianapolis citizens. Indeed, according to technical information provided by the manufacturer and relied on by IPD, CS gas is "relatively nontoxic" and produces little or no lasting health effects. (CS Chemical Technical Infor. Manual, Defendants' Ex. C, at p. 15). Although the agent generally causes burning in the throat and a constricting sensation throughout the chest, the technical materials state that treatment requires little more than fresh air and verbal reassurance:

> No therapy has been necessary, and it is difficult to visualize any therapy that would be as effective as fresh air. Merely talking with a subject with severe chest symptoms seemed sufficient to bring rapid relief.

(Technical Manual at p. 15). Moreover, General Order 30.01 requires that "[a]ny arrested person on whom the CS Repellent was used [ ] be sent to Wishard Hospital for examination" and that "Jail personnel [ ] be advised of the usage." (General Order 30.01, Defendants' Ex. A). Finally, General Orders 30.01 and 18.05 dictate that officers should only utilize CS gas when reasonably necessary to subdue an individual resisting arrest or to prevent injury or potential harm to the officers or others.

Thus, the information relied on by IPD states that CS gas is relatively nontoxic, its use is limited to situations where reasonably necessary and in reasonable amounts, and officers are admonished to send all arrestees on whom the repellent is used to a hospital for examination as a precaution. When these facts are considered in light of the absence of other incidents involving injuries caused by the use of CS spray, we think that the "City has promulgated [a] fairly extensive policy on the use of" force in general as well as the use of CS spray in particular. *Donovan*, 17 F.3d at 955. Indeed, although IPD could have provided more training with regard to the treatment of CS-affected individuals, "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Harris*, 109 S.Ct. at 391, 109 S.Ct. at 1224. Accordingly, we find that no reasonable jury could conclude that the City's CS gas policy was so inadequate as to be deliberately indifferent to the rights of its citizens,

and we grant the defendant City's motion for summary judgment.[11]

## IV. CONCLUSION

In sum, the Court finds that the issue of qualified immunity is dependent upon which view of the facts is accepted by the jury. As a result, we DENY the defendant officers' motion for summary judgment based on qualified immunity. However, we also find that the City's policy regarding the use of CS spray was not so inadequate as to constitute a deliberate indifference to constitutional rights. We therefore GRANT the City's motion for summary judgment with regard to the municipal liability claim.

It is so ORDERED.

---

11. Plaintiff makes much of the fact that the technical manual identifies a risk of death involved with the use of CS gas:

> If the respiratory disability were secondary to reflex laryngospasm, it is possible that this reflex could be maintained by panic until cerebral anoxia produced unconsciousness and perhaps death.

(Technical Manual, at p. 15). However, Plaintiff has neither alleged nor provided evidence to establish that Bryant suffered from a reflex laryngospasm during the incident, or that his respiratory problems were in any way related to that condition. Thus, the mere fact that CS spray could cause death under these limited circumstances simply is insufficient to create a genuine issue of material fact that the need for more rigorous standards regarding the use of CS spray was so obvious that the city was deliberately indifferent to the safety of Indianapolis citizens.