Trevor **RHODES**, Plaintiff,

v.

John **GUARRICINO**, individually, Stephen I. Leitman, individually, and the **Highland Falls–Fort Montgomery Central School District**, Defendants.

Brian M. **Ricci**, Plaintiff,

v.

John Guarricino, individually, Stephen I. Leitman, individually, and the **Highland Falls–Fort Montgomery Central School District**, Defendants.

Nos. 98 Civ. 2343(WCC), 98 Civ. 2164(WCC).

United States District Court, S.D. New York.

May 10, 1999.

Lovett & Gould, White Plains, New York City, Jane Bilus Gould, of counsel, for plaintiffs.

McCabe & Mack LLP, Poughkeepsie, New York City, David L. Posner, Laura Rapacioli, Laura Rapacioli, of counsel, for defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This case, stating claims for a violation of plaintiffs' Fourth Amendment rights under 42 U.S.C. § 1983, is before the Court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. Plaintiffs claim that a check of their hotel room by their principal-chaperone during a class trip, which revealed alcohol and significant quantities of marijuana, violated their Fourth Amendment right to be free from unreasonable searches and seizures. For

the reasons stated below, defendants' motion is granted.[1]

## BACKGROUND

All the facts recited herein are undisputed, unless otherwise indicated. Plaintiffs Trevor Rhodes and Brian M. Ricci ("plaintiffs") were, at all times relevant to this action, students at James I. O'Neill High School in Highland Falls, New York, a public high school. In March of 1998, plaintiffs, with a group of other classmates, took a school-sponsored trip to Disney World in Florida, chaperoned by John Guarricino, his wife, and other adults. The students stayed in a hotel while in Florida, and it is Guarricino's search of plaintiffs' hotel rooms that gives rise to this litigation.

Prior to the trip, the students were provided with a brochure that specifically notified the participants that they would be subjected to "room checks." Defendants' Exhibit A. Guarricino also addressed the students at a pre-trip meeting and explained that their rooms would be checked, Guarricino Deposition at 140–45, although some dispute remains between the parties as to whether Guarricino used the term "room checks" or "searches." Plaintiffs' Memorandum of Law at 2. The trip brochure also advised that "Any behavior discrepancies, either direct or by close association, will be dealt with through standard 'School Disciplinary Codes and Procedures.'" Defendants' Exhibit A.

Parental permission slips were also obtained from each participant, including both plaintiffs, and were co-signed by a parent and the student. The permission slips stated in part:

We understand that responsible behavior is imperative to a successful and safe trip. We accept the financial responsibility of our son/daughter coming home early through separate travel accommodations if the coordinator and chaperones deem that the student's individual behavior is in violation of school policy, standards, and/or civil law. . . . WE UNDERSTAND THE ABSOLUTE FORBIDDEN USE OF ANY ALCOHOL OR DRUGS BY OUR SON/DAUGHTER, AND THAT PARTAKING IN SUCH SUBSTANCES WOULD SUBJECT HIM/HER TO EARLY DEPARTURE AND SCHOOL DISCIPLINE POLICIES UPON RETURN.

Defendants' Exhibit B (emphasis in original). In addition, each student and a parent, including plaintiffs, signed a "Drug, Alcohol and Incident Free Pledge." The pledge stated in relevant part:

It is imperative that students understand that this is an earned privilege and a school sanctioned activity that can be enjoyed without improper behavior or incidents of drug and alcohol use. This most unique O'Neill occasion must not be tainted in any way by poor individual judgment and choice. Direct involvement or implication by association can result in school levied consequences for such action. . . .

As a participating O'NEILL student, I pledge and personally guarantee, with the support of my parent/guardian, that:

(1) I will participate in the '98 senior trip without the use of any drugs, alcohol, or any illegal substance;

(2) My behavior will be respectful of people and property.

I understand that violation of this guarantee will result in my disqualifica-

---

**1.** Plaintiffs name Principal John Guarricino and the Highland Falls–Fort Montgomery Central School District as defendants. We note that plaintiffs make no allegations against the school district distinct from those made against Guarricino. Thus, we assume that plaintiffs seek to hold the school district responsible for Guarricino's conduct because his actions were part of a general "custom and practice" at the school. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Since we now hold that Guarricino's actions were not constitutionally prohibited, the school district is clearly not liable for his conduct.

tion from senior activities and graduation ceremonies.

My signature and that of my parent/guardian will serve as verification of my understanding of the behavioral terms required, and my pledge to abide by them.

Defendants' Exhibit C.

After signing the pledge and being provided with the aforementioned brochure, plaintiffs, and the other participants, left on March 19, 1998 for their four-day holiday. Participation in the trip was purely voluntary. On Friday, March 20, Mr. and Mrs. Guarricino returned to their room in the hotel. In order to get to their room, they were required to walk past plaintiffs' rooms. A large group of students were congregated in the hallway outside of the plaintiffs' rooms. Defendants' Rule 56.1 Statement at ¶ 11. Moreover, Guarricino asserts and plaintiffs do not deny that a strong odor of marijuana permeated the area of the hallway. *Id.* at ¶¶ 11–12. Mr. Guarricino then contacted hotel security, inquiring whether he could gain access to these rooms because he suspected the presence of marijuana. *Id.* at ¶ 14. In response, Marilyn Radcliff, a hotel representative,

> .... advised Mr. Guarricino that it was [the hotel's] policy to permit adult chaperones in charge of student groups into their assigned rooms. It is Disney's policy that the adult chaperones in charge of student groups can enter the students' room even without the students being present when there is a dangerous or hazardous situation or if they report to us their belief that the students have alcohol or drugs in the room.

Radcliff Affidavit at ¶ 4. While there is some dispute among the parties as to how promptly thereafter Guarricino entered plaintiffs' rooms, and plaintiffs imply that it may have been several hours after Guar-

ricino smelled marijuana in the hallway, it is undisputed that Guarricino entered the rooms on the same night that his suspicion was aroused. Plaintiffs' Rule 56.1 Statement ¶ 18.

Guarricino proceeded to search the majority of the twenty rooms occupied by the students. Guarricino's Deposition at 169. He entered each room with hotel security employees, and a hotel security pass key was utilized in order to gain access. Defendants' Rule 56.1 Statement at ¶ 16. The students were not present during the search. Guarricino's Deposition at 166. With the exception of searching various safes within each room, Guarricino generally searched only those areas in plain view. Defendants' Rule 56.1 Statement at ¶ 18. Some debate also exists amongst the parties whether he searched open or closed dresser drawers, Plaintiffs' Rule 56.1 Statement ¶ 25, but it is undisputed that Guarricino did not open suitcases or any other closed containers. Defendants' Rule 56.1 Statement at ¶ 18. Finally, Guarricino asserts and plaintiffs do not deny that Guarricino searched the rooms safes, having his suspicion aroused after seeing a safe key sitting in plain view in one of the plaintiff's rooms. Guarricino's Deposition at 174; Plaintiffs' Rule 56.1 Statement at ¶¶ 26–7. For most of the safe searches, Guarricino also utilized a pass key provided by hotel security. Guarricino's Deposition at 175. This search ultimately uncovered an undisclosed amount of marijuana in the room safe in Ricci's room, and a bottle of alcohol was found in a drawer in Rhodes's room.[2] Defendants' Rule 56.1 Statement at ¶ 17. The smoke detector in Rhodes' room was also disconnected and two burning scented candles were also found. *Id.* Plaintiffs were sent home early from the trip and ultimately suspended from school for three days. Plaintiffs Exhibit I. As a result of this search and the ensuing punishment, plaintiffs sued Guar-

---

**2.** It should be noted, however, that groups of students, not merely each plaintiff alone, occupied these rooms.

ricino and the Highland Falls–Fort Montgomery Central School District under 42 U.S.C. § 1983, claiming a violation of their constitutionally protected Fourth Amendment right to be free from unreasonable searches and seizures.[3]

## DISCUSSION

### I. *Introduction*

■ The law is clear, and the parties do not dispute, that students, whether on-campus or traveling off-campus as part of a school activity, are protected by the Fourth Amendment. *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The law is equally clear, however, that students who are under public school supervision have diminished Fourth Amendment protection. *Id.* at 340–43, 105 S.Ct. 733. Ordinarily, a search, even one that may be permissibly carried out without a warrant, must be based upon "probable cause" to believe that a violation of the law has occurred. *Id.* at 340, 105 S.Ct. 733. However, when public students are acting in a supervised environment, under the control of public school teachers or administrators, the search must merely be reasonable under the given circumstances, and probable cause need not exist for the search to be constitutional. *Id.* at 341, 105 S.Ct. 733. Determining the reasonableness of any student search involves a two-fold inquiry: first, one must consider whether the action in question was justified at its inception, and, second, one must determine whether the search as actually conducted was reasonable in scope. *Id.* at 341–42, 105 S.Ct. 733. The Supreme Court has explained this two-step analysis in the following way:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* We will proceed to apply this analysis, as numerous courts have done since *T.L.O.* was decided. *See, e.g., Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146 (7th Cir.1997); *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075 (5th Cir. 1995); *Cornfield v. Consolidated High Sch. Dist.*, 991 F.2d 1316 (7th Cir.1993).

### II. *Fourth Amendment Analysis*

■ Put simply, we must determine whether Guarricino's search of plaintiffs' rooms was reasonable.

> The determination of the standard of reasonableness governing any specific class of searches requires balancing the need to search against the invasion which the search entails. On one side of the balance are arrayed the individuals's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.

*T.L.O.*, 469 U.S. at 337, 105 S.Ct. 733 (internal quotations omitted). We will be-

---

**3.** By letter dated April 28, 1999, plaintiffs voluntarily dismissed Stephen 1. Leitman, the Superintendent of the school district, from the suit, and stated their intention not to pursue their Second, Third, and Fourth Causes of Action. Consequently, all claims against Leitman are hereby dismissed, and all claims for the deprivation of protected First Amendment, due process, and liberty interests are also dismissed. Additionally, we assume that plaintiffs have abandoned all claims pursuant to 42 U.S.C. § 1985, since they fail completely to address this claim in any of the papers submitted to the Court, and because this suit states no claim whatsoever for class-based discrimination, as 42 U.S.C. § 1985(3) requires. *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

gin with the "side of the balance" pertaining to the students legitimate expectation of privacy. This factor tips decisively in favor of defendants. First, plaintiffs' were provided with brochures that cautioned them against using drugs or alcohol while on the trip, and warned them that the same type punishment that was eventually levied against them might ensue if such violations occurred. Plaintiffs, and their parents, also signed pledges promising that the students would not use drugs or alcohol on the trip. Furthermore, plaintiffs were specifically informed that the school administrators might engage in room checks during the course of the trip. While the parties dispute whether it was conveyed that these "checks" would actually include "searches," it is a distinction of little import, because the parties were specifically warned not only that drugs and alcohol were proscribed, but that the defendants might enter their rooms to discover any violation of these rules. While we do not hold that such warnings gave defendants permission to engage in any kind of search, no matter how invasive, it is clear that plaintiffs had no legitimate basis for expecting their use of the rooms to be completely private.

This is especially true when the activity that initially aroused Guarricino's suspicion occurred entirely in a public hallway. A group of boys had gathered in the hallway outside of plaintiffs' rooms, which was itself sufficient to arouse suspicion in any conscientious chaperone. Moreover, according to Guarricino, the smell of marijuana permeated the air in the hallway, and plaintiffs' do not dispute this assertion. In fact, it appears that at least one of the plaintiffs was aware that signs of his illegal activity would travel into the public hallway, since he and/or his roommates burned scented candles in an attempt to mask the smell of marijuana. In an analogous situation, the Eighth Circuit ruled that a canine sniff in the common corridor of a hotel, revealing the presence of drugs, gave investigating police officers sufficient cause to enter the hotel room in question. *United States v. Roby,* 122 F.3d 1120 (8th Cir.1997).[4]

Plaintiffs strenuously argue that the *T.L.O.* rule, applicable to students, does not apply in an off-campus setting. Where, however, a field-trip is part of a school activity, organized at school, and administered completely by school employees, *T.L.O.* clearly applies. We do not believe that students are shielded by the more stringent "probable cause" standard merely because their teachers have decided to engage in some educational activity off-campus rather than on-campus. Where technology and increased funding have allowed teachers to move beyond the school grounds in order to better educate our children, we will not conclude that the power of teachers to protect students' safety is reduced because they are no longer on a traditional campus. The problems of drugs, crime, and violence, specifically cited by the Supreme Court as justifying the special Fourth Amendment rules for students, *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 661–62, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), clearly do not abate when the students leave school property. Indeed, it is clear that "government's need for effective methods to deal with breaches of public order," *T.L.O.,* 469 U.S. at 337, 105 S.Ct. 733 (internal quotations omitted), is even greater beyond the closely supervised school premises. As the Fifth Circuit has held, "We reject the suggestion that the location of this seizure heightens the otherwise relaxed fourth amendment standards applicable to school searches and seizures. School field trips often present greater, not lesser, challenges to school officials trying to maintain order and discipline than do the relatively orderly confines of a school." *Hassan,* 55 F.3d at 1080 n. 15.

---

4. We concede that the officers in *Roby* merely secured the room while waiting for a search warrant to be executed, 122 F.3d at 1123, but these officers were restricted by the far stringent "probable cause" standard, a standard to which Guarricino was not bound.

We likewise believe that the fact that this search was conducted during an out-of-state field trip counsels more strongly, not less strongly, in favor of dismissing plaintiffs' case. *Hassan,* 55 F.3d 1075; *Webb v. McCullough,* 828 F.2d 1151 (6th Cir.1987). We are heavily influenced by the fact that these events occurred thousands of miles from the students' home and parents. Much more than when on their home campus, defendants were acting in loco parentis to plaintiffs. As the Sixth Circuit has held in *Webb,* in concluding that a principal's unannounced entry and search of a student's hotel room did not violate the Fourth Amendment, the greater range of activities that occur during extracurricular activities creates "a need for a greater range of intervention" by administrators. *Webb,* 828 F.2d at 1157.

To be clear, we are not now holding that the in loco parentis doctrine actually supplants the *T.L.O.* standard in cases of off-campus searches, and to the extent that the *Webb* court so holds, we reject this analysis. However, to the extent that *T.L.O.* requires us to assess the general reasonableness of the search, the fact that Principal Guarricino was acting in loco parentis to these plaintiffs strongly argues the reasonableness of his conduct. "To expose administrators and school districts to increased tort liability while denying them the authority necessary to lessen the likelihood of student injury would be inequitable...." *Webb,* 828 F.2d at 1157. We note that other school districts have incurred significant tort liability while administering such field trips. *See, e.g., Morris v. Douglas County Sch. Dist. No. 9,* 241 Or. 23, 403 P.2d 775 (1965) (en banc).

This is not to say that we are blind to the fact that the search in the instant case was conducted in plaintiffs' hotel rooms. All individuals certainly have some expectation of privacy in their hotel rooms, *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), and the

plaintiffs' expectation of privacy there was higher than if it would have been in a school classroom. We simply hold that searches of students by school teachers or administrators "depends on the context within which the search takes place," *T.L.O.,* 469 U.S. at 337, 105 S.Ct. 733, and this is true whether the student is on or off-campus. Thus, we hold that *T.L.O.'s* diminished Fourth Amendment protection applies whether or not the student is on or off the school grounds, as long as the off-campus search is conducted by a school employee on a school-sponsored excursion or trip; the mere setting of the search does not erase the well-established constitutional standard for searches of students and replace it with the more stringent probable cause standard, nor does it erase the *T.L.O.* standard. Instead, the setting of the search should merely be one of the many factors used in assessing the reasonableness of the search and, in the instant case, the setting counsels strongly in 'favor of the searches' reasonableness.

■ Applying this analysis to the undisputed facts in this case impels us to conclude that in a school sponsored trip, where the students have signed waivers promising not to use drugs or alcohol, where they have been specifically informed that room checks will be conducted, where the school staff travels far from home with these students and thus is acting in loco parentis, and where a school official smells marijuana around a cluster of students outside one of their rooms, and thus has strong reason to believe that his wards are engaging in illegal activity, it is reasonable to ask hotel security to open the students' rooms and to search them.

The search here was far less intrusive than the measures approved by a number of other courts in circumstances creating a lesser reason to suspect wrongdoing. For example, in *Hassan,* 55 F.3d 1075, a student who misbehaved while touring a correctional facility was imprisoned for fifty minutes within the facility; the Fifth Circuit found this confinement reasonable. In

*Bridgman,* 128 F.3d 1146, a student who merely misbehaved in class was subjected to an extensive medical examination by the school nurse in order to determine whether he was under the influence of drugs; the Seventh Circuit found this search to be reasonable. Similarly, in *Cornfield,* 991 F.2d 1316, where the only basis for suspecting the plaintiff of wrongdoing was that plaintiff had a bulge in his pants and had been a disciplinary problem in the past, the Seventh Circuit found that a full strip search conducted by two school employees still did not violate the Fourth Amendment. Put simply, numerous courts have found that far more invasive searches and seizures, such as strip searches, medical examinations, and even temporary imprisonment, even where the evidence of wrongdoing was less compelling than in the instant case, do not violate the Fourth Amendment.

█ Finally, we address plaintiffs' claim that since Guarricino had no "individualized suspicion" in conducting the search in question, we must alter our analysis under *T.L.O.* While the extent of Guarricino's individualized suspicion is unclear from the record before us, this issue has no bearing on our ultimate determination. Since *T.L.O.,* the Supreme Court has specifically held that individualized suspicion is not required for a search to be reasonable. *Vernonia,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564. While we hold that the extent of suspicion and the scope of the search is clearly relevant to assessing the overall reasonableness of the search in question, the Supreme Court's analysis in *Vernonia* clearly demonstrates that Guarricino's search was reasonable, whether or not there was reason or not to suspect any particular plaintiffs.

*Vernonia* involved a highly invasive search, and one completely lacking in individualized suspicion. There, the school district implemented a drug testing policy for all students wishing to partake in sports. *Id.* at 650, 115 S.Ct. 2386. All such students were required to give a urine sample to test for illegal drugs, taken while a same-sex monitor stood approximately twelve to fifteen feet away and observed the student. *Id.* The students were also required to divulge whether they were taking any prescription medication by providing a copy of the prescription or a doctor's authorization. *Id.* In finding these searches reasonable, the Supreme Court cited the very same factors that are present in the instant case. First, the Court emphasized that the plaintiff was a student, and thus searches "unsupported by probable cause can [still] be constitutional." *Id.* at 653, 115 S.Ct. 2386. Second, the *Vernonia* Court emphasized that because playing a sport is purely discretionary, the students "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Id.* at 657, 115 S.Ct. 2386. The plaintiffs' participation in the field trip in the instant case, of course, was also completely voluntary, and traveling far from home without their parents should have indicated to them that they would be exposed to a "degree of regulation even higher than that imposed on students generally." *Id.* Finally, in balancing the intrusiveness of the search against the "legitimate government interests" involved, *id.* at 652–53, 115 S.Ct. 2386 (internal quotations omitted), the *Vernonia* Court engaged in a lengthy discussion of the devastating effects of drug use on our nation's school children. *Id.* at 660–62, 115 S.Ct. 2386. This compelling interest, of course, was likewise the motivating force behind Guarricino's search.

Application of *Vernonia* by the circuits, in cases involving no individualized suspicion whatsoever, shows that courts have allowed generally intrusive searches, even where there was far less need for an immediate search than existed in the instant action. *DesRoches v. Caprio,* 156 F.3d 571 (4th Cir.1998) (principal attempted to search the personal belongings of nineteen students after learning that a pair of shoes may have been stolen); *Todd v. Rush*

*County Schs.,* 133 F.3d 984 (7th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998) (random suspicionless drug testing permitted for any student wishing to engage in any extracurricular activities); *Thompson v. Carthage Sch. Dist.,* 87 F.3d 979 (8th Cir.1996) (after a report from a bus driver that "fresh cuts" had appeared on a school bus seat, every male student in grades six through twelve was told to remove his jacket, shoes, and socks, and to empty their pockets, and then each was searched with a metal detector while his jacket pockets were inspected). These cases lead us to conclude that the lack of individualized suspicion does not dramatically change the Fourth Amendment analysis, but is only another factor in assessing the reasonableness of the search. Here, Guarricino actually possessed far more individualized suspicion than existed in *Vernonia,* since his investigation was not purely prophylactic; Guarricino had specific evidence that some of his students were engaging in drug use on the very evening he conducted his search. We believe that if the Fourth Amendment is not violated by a completely suspicionless drug test in which students are forced to urinate in the presence of a school employee and forced to reveal confidential medical information, *Vernonia,* 515 U.S. at 653, 115 S.Ct. 2386, Guarricino's room check and/or search, after smelling marijuana in the hallway, is undoubtedly reasonable as well. Defendants' are entitled to summary judgment as matter of law. Fed.R.Civ.P. 56.

III. *Qualified Immunity*

 None of the parties disputes that Guarricino, as a state actor, possesses qualified immunity. Qualified immunity shields state actors from personal liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), "or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Brown v. D'Amico,* 35 F.3d 97, 99 (2d Cir.1994); *see also Walker v. McClellan,* 126 F.3d 127, 129 (2d Cir.1997); *Davidson v. Scully,* 114 F.3d 12, 14 (2d Cir.1997); *Gardiner v. Incorporated Village of Endicott,* 50 F.3d 151, 156 (2d Cir.1995). While a defendant is not entitled to immunity merely because the "very action in question has not previously been held unlawful," *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the decisional law of the Supreme Court and the applicable circuit must have already defined the right with "reasonable certainty" in order for a state employee acting in his or her official capacity to be held liable. *Soares v. State of Connecticut,* 8 F.3d 917, 922 (2d Cir.1993) (internal quotations omitted). It is well-established that if, at the time of the complained of conduct, the law of the Supreme Court or the applicable circuit has not clearly established that such conduct violates the Constitution, the state actor is entitled to qualified immunity. *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 531 (10th Cir. 1998) (defendants entitled to qualified immunity because, inter alia, plaintiff "has pointed to no Supreme Court or Tenth Circuit precedent establishing that any of their actions could constitute a violation of one's [constitutional rights]"); *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993) (defendant entitled to qualified immunity because complained of conduct did not violate a clearly established right based upon "the caselaw of the Supreme Court and this circuit"); *Cameron v. Seitz,* 38 F.3d 264, 275 (6th Cir.1994) (defendants entitled to qualified immunity because "we know of no Supreme Court or Sixth Circuit case clearly extending" to plaintiff's claim); *Courson v. McMillian,* 939 F.2d 1479, 1497–98 (11th Cir.1991) (defendant entitled to qualified immunity because he "cannot be held to a standard of conduct which is unsettled by the Supreme Court or this circuit at the time of his actions").

For the reasons stated in our analysis above, we conclude that Guarricino committed no constitutional violation whatsoever. However, even if the Second Circuit or the Supreme Court were ultimately to rule that his conduct did violate the Fourth Amendment, we are convinced that this principle was not clearly established at the time the violation occurred, nor even today. The Supreme Court has clearly held that students are entitled to diminished Fourth Amendment protection, and may be subjected to invasive searches, *T.L.O,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720, even absent any individualized suspicion whatsoever, *Vernonia,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564; given this, we cannot hold that it is clearly established that Guarricino's decision to enter plaintiffs' rooms, after smelling marijuana in the public hallway, violated the Constitution. Indeed, plaintiffs' counsel herself effectively concedes Guarricino's entitlement to qualified immunity when she writes, "There has been no Supreme Court decision nor any decision by the United States Court of Appeals for the Second Circuit addressing the issue presented here, i.e.[,] the governing Fourth Amendment standards for off-campus searches by school officials." Plaintiffs' Memorandum of Law at 12. The Court's own search of the case law confirms this assertion, and it is precisely for this reason that Guarricino is entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted. Plaintiffs' complaint is hereby dismissed with prejudice, and with taxable costs to defendants.

SO ORDERED.