Cynthia **EASLEY**, Individually And as Administrator of the Estate of Christopher B. Easley, Deceased, Plaintiff,

v.

David **KIRMSEE**, Edward Gritzner III, Robert Linder, Keith Mulhollon, William W. Walser, Sean Borkhuis, Sgt. Farnsworth, Robert Craig, Jason Hinz, James Rozenski, Lake Geneva, Geneva Township, Linn Township, and Walworth County, Defendants.

No. 01–C–938.

United States District Court, E.D. Wisconsin.

Nov. 26, 2002.

Charles A. Boyle, Charles A. Boyle & Associates, Chicago, IL, for Plaintiff of Petitioner.

Bennett J. Brantmeier, Krek & Brantmeier Jefferson, WI, Gregg T. Heidenreich, Law Offices of Stilp & Cotton, Brookfield, WI, Andrew A. Jones, Charles H. Bohl Wyte Hirschboeck Dudek, Milwaukee, WI, Raymond J. Pollen, Crivello Carlson Mentkowski, Milwaukee, WI, for Defendant or Respondent.

## DECISION AND ORDER

CURRAN, District Judge.

On October 26, 2000, Christopher Easley was shot and killed by police officer David

Kirmsee. At the time of the shooting, Easley was acting under the influence of alcohol and had cut himself several times with a knife, resulting in loss of blood. Law enforcement officers from Lake Geneva, Geneva Township, Linn Township, and Walworth County had been dispatched to the Easley home in response to a 911 call from Christopher's mother Cynthia. When the officers located Christopher in a subdivision in the City of Geneva, they ordered him to drop the knife he was displaying. When Christopher charged Officer Kirmsee with the knife, the officer shot him.

Cynthia, who is the administrator of Christopher's estate, then filed this lawsuit in which she claims that the Defendants violated Christopher's rights under the Fourth and Eighth Amendments and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. She also claims that they are liable for battery, for breach of the duty to hire, train, and supervise, and for wrongful death under Wisconsin law. She is seeking compensatory and punitive damages pursuant to 42 U.S.C. § 1983 and state tort law.

The Defendants have answered and denied liability and they have all moved for summary judgment on the grounds that no material facts are in dispute and that they are entitled to judgment as a matter of law. *See* Federal Rule of Civil Procedure 56. The Plaintiff has not responded and her time to respond has long passed. Therefore, the Plaintiff's right to respond is deemed waived and the court will proceed to resolve the motions. *See* Civil Local Rule 7.1.

## I. *FACTS*

In support of their motion for summary judgment, the Defendants have submitted a list of proposed findings of fact which are supported by specific citations to evidentiary materials in the record. The Plaintiff has not opposed any of the findings in the manner required by Civil Local Rule 56.2(b). Therefore, the court concludes that there is no genuine material issue as to any of the Defendants' proposed findings, *see LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 389 (7th Cir.1995), and, consequently, adopts the following findings:

1. Plaintiff, Cynthia Easley, individually and as administrator of the estate of Christopher B. Easley, is an adult citizen of the State of Wisconsin, who resides at W3527 Lakeview Drive, Lake Geneva, Wisconsin.

2. Plaintiff, Cynthia Easley, is the mother of Christopher Easley, deceased. She has been separated from Christopher Easley's father, William J. Easley, since February of 1999, but not legally divorced.

3. On October 26, 2000, decedent, Christopher Easley, resided with his father, William J. Easley at W3547 Lakeview Drive, Town of Geneva, Wisconsin.

4. Christopher was eighteen years old at the time of the shooting. He was 6 feet tall, right-handed, and weighed approximately 175–180 pounds. The year prior to October 26, 2000, had been his worst year academically in school. He was being influenced by his peers. He was indulging in drugs and alcohol. He had been in a special education class for two and one-half years.

5. On October 26, 2000, Christopher did not have a car or a driver's license.

6. At approximately 4:12 a.m. on October 26, 2000, Officer Kirmsee arrested Christopher for operating a motor vehicle while intoxicated after he had been involved in a one-vehicle accident. Christopher had a large avulsion over his eye, his shirt was full of blood, and he smelled of intoxicants. The vehicle

**948**

had been damaged, airbag deployed, and the windshield broken. Officer Kirmsee bandaged Christopher's head and waited for the ambulance to arrive.

7. After the alcohol related arrest and a trip to the hospital in the ambulance for stitches for his injuries from the auto accident, Christopher was released to the care of his mother. His blood alcohol content was 0.088.

8. When Christopher was released from the hospital to Mrs. Easley, as a responsible person under § 354.24, Wis. Stats., he was in a proper emotional state and Mrs. Easley was not concerned that he may be a danger to himself or others. Officer Giovannoni, who relieved Officer Kirmsee, indicated that Christopher appeared embarrassed, sore, and groggy when he interviewed him at the hospital. Mrs. Easley testified that Officer Giovannoni, in a very kind, comforting and respectful manner, explained to Christopher the consequences of his actions concerning being 18 and all the repercussions of his actions.

9. Mrs. Easley took Christopher home, fixed him breakfast and gave him Tylenol. She then went back to work as she did not have any particular concern that Christopher was a threat to himself or others. Nothing Christopher did or said in connection with his arrest in the early morning hours of October 26, 2000, led Mrs. Easley to believe her son was a threat to himself or anyone else.

10. Nothing Christopher did or said between picking him up from the hospital that morning and when she returned from her swim meet that evening led her to believe that Christopher was a threat to himself or anyone else.

11. When Mrs. Easley returned home around 9:45 p.m. from the swim meet in Madison, she noticed a strong smell of alcohol. Christopher was in the kitchen, on the phone (jovial/laughing), with a large drink of some kind.

12. Christopher knew he was not supposed to drink alcohol because he had problems when he drank. When he was drinking, Christopher's behavior was unpredictable and he could be quite violent.

13. Mrs. Easley poured the alcohol down the sink. She then looked for the bottle and was intentionally blocked by Christopher, who was still on the telephone, but she was able to get the bottle and pour it down the sink.

14. Christopher started yelling and getting physical after Mrs. Easley poured the alcohol down the sink.

15. Christopher started punching and kicking the cabinets. He screamed at his mother. He pulled drawers out and dumped the contents on the floor.

16. Christopher grabbed a knife and started cutting himself repeatedly on the arms, drawing blood.

17. Although Mrs. Easley did not feel threatened, she knew Christopher would try to hurt himself. He started cutting himself while she was on the telephone to the police.

18. Mrs. Easley was trying to stop her son from cutting himself. She grabbed his arm. He pushed her and she fell. Her youngest son, Charles, came up from the basement.

19. As Mrs. Easley grabbed Charles to leave the residence, Christopher followed, ramming his hand through the glass in the front door. Before Mrs. Easley left the house with Charles, Christopher made a statement to the effect of "This is it. I'm going to slit my throat."

20. Mrs. Easley was aware of Christopher's past emotional problems. Officers Kirmsee and Linder had prior con-

tact with Christopher and were aware of Christopher's prior suicidal tendencies.

21. Mrs. Easley got Charles out of the house for his own safety. Although she never felt Christopher would harm Charles or her, she did not know what Christopher was going to do next. She knew he was not going to calm down soon.

22. Mrs. Easley knew that Christopher was going to cut himself when he reached for the knife. He had done it before. Christopher was a "cutter."

23. Mrs. Easley did not contact any law enforcement officers or entities regarding Christopher between when she picked him up at the hospital that morning and when she called 911 that night.

24. The Town of Geneva Police Department's officers were dispatched to the Easley residence at approximately 9:54 p.m. on October 26, 2000, in response to a 911 call from Mrs. Easley. She felt that Christopher was out of control and she did not know what he would do next.

25. Mrs. Easley told the 911 operator that her son had gone berserk; he had a knife and was cutting himself and the police needed to hurry. She may have said "go run" to her son, Charles, who was clinging to her, when she was on the phone.

26. Mrs. Easley took Charles to her home, which was nearby. When at her home she heard the door slamming and she knew Christopher was outside somewhere. She thought he went into the woods at the side of the house.

27. Mrs. Easley believed Christopher would charge an officer, but stop short, making you back away, not making physical contact. Mrs. Easley believed Christopher would make the initial charge or lunge at the officer.

28. Mrs. Easley was yelling to Christopher, who screamed twice before the police arrived.

29. The police arrived within five minutes after Mrs. Easley went back to her husband's house. Ms. Easley provided no information about Christopher's past psychiatric problems to any law enforcement officers on the scene after her 911 call prior to the shooting.

30. Although Mrs. Easley does not recall exactly what she discussed with the officers, she knew Christopher had a violent temper. He would respond with his temper when he felt threatened or defensive.

## TOWN OF GENEVA PROPOSED FINDINGS OF FACT

31. Defendants, David Kirmsee, Robert Linder, and Sean Borkhuis, were at all times relevant to this action, police officers employed by defendant, Town of Geneva Police Department, located at N3496 Como Road, Lake Geneva, Wisconsin.

32. When Officers Borkhuis and Kirmsee arrived at the Easley residence they noticed blood on the front entryway and were informed that Christopher had left the residence on foot. Officer Kirmsee went inside the residence and noticed blood all over the walls and floors, and things were thrown around.

33. It was believed that Christopher took a walking path from his residence to the Edgewood Hills Subdivision or the location of the shooting. The officers were informed by Mrs. Easley which way she thought Christopher went, that he had cut himself, had screamed at her, and had a knife.

34. While Sergeant Borkhuis was tracking Christopher through the yard, and woods, he heard a gut wrenching scream and assumed Christopher had

hurt himself again. He was tracking Christopher by following his blood path. The scream was also heard by Officer Kirmsee.

35. Officer Kirmsee notified dispatch of Christopher's description and condition. The various police departments searched for approximately 45 minutes and had the whole area around the Easley homestead blocked off, had K–9 units, an infrared tracker from the fire department, and had an ambulance nearby.

36. When Christopher was located in a subdivision in the City of Geneva at approximately 11:00 p.m., all the police departments responded to the area. Sergeant Borkhuis stayed in the area of the Easley residence and directed Officers Kirmsee and Linder to respond, as well as the paramedics.

37. The area where Christopher was found was lit up by the various officer's flashlights and spotlights. When Officers Kirmsee and Linder arrived at Edgewood Hills Subdivision, three additional squads were present. Christopher was not in custody, was bloody and armed with a knife.

38. Officer Kirmsee watched Christopher walk to the front of a house. The officer proceeded around the home, located Christopher, and kept a visual on him. The officer drew his service weapon and followed Christopher up the hill.

39. When Officer Kirmsee told Christopher to drop the knife, Christopher stopped and began moving towards the officer, raising his arms up and down, still holding the knife. Officer Kirmsee attempted to keep a distance of approximately 35–40 yards. Several other officers had their weapons drawn.

40. Officer Kirmsee turned on his flashlight and yelled for Christopher to stop and drop the knife.

41. Christopher continued walking toward Officer Kirmsee, raising the knife and stating "fuck you". Christopher did state to Officer Kirmsee "Are you still telling me what to do?", as Kirmsee began to move away.

42. Officer Linder was next to Officer Kirmsee with his weapon drawn. Officer Kirmsee walked backwards away from Christopher. Christopher moved towards Officer Kirmsee, then away from Kirmsee, then charged down the hill towards Officer Kirmsee with knife in hand.

43. Officer Kirmsee did not turn and run from Christopher as he did not want to turn his back. The officers were trying to contain Christopher so he did not get away. Officer Kirmsee had no where else to go. From Officer Kirmsee's training prior to October 26, 2000, the distance requirement to react to an edged weapon is within a 21′ barrier.

44. As Officer Linder watched Christopher charge Officer Kirmsee, he could not believe that Officer Kirmsee had not shot Christopher yet. Officer Linder's estimate of the distance between Christopher and Officer Kirmsee at the time of the shooting was approximately 15 feet.

45. On October 26, 2000, at approximately 11:13 p.m., Officer David Kirmsee shot Christopher to death. Christopher still had the knife in his hand when he hit the ground. Christopher's blood alcohol level at the time of the shooting was 0.14. At the time of the shooting, Officer Kirmsee believed he was in immediate risk of death or grave bodily injury because of Christopher's actions.

46. Officer Kirmsee did not consider his baton or O.C. spray because it would have put him in danger. He shot Christopher in the chest as he was trained to do.

47. The Town of Geneva Police Department does not have a negotiator, suicide squad or response team. A negotiator was not called in as Christopher was missing and they were searching for him. From the time Christopher was found in the subdivision, to the time he was shot, was a matter of minutes.

48. Prior to their employment as police officers for the Town of Geneva, Officers Kirmsee, Borkhuis, Linder and Giovannoni had obtained a certification from the State of Wisconsin for successfully completing all mandated state training requirements and were qualified to hold the position of sworn police officers.

49. Through the state certification training, Officers Kirmsee, Borkhuis, Linder and Giovannoni received state mandated training on the use of force, both deadly and non-deadly, as well as training on the continuum of force.

50. Officers Kirmsee, Borkhuis, Linder, and Giovannoni, as officers employed by the Town of Geneva, have gone through training received during the state certification process and in the continued annual training, all officers for the Town of Geneva received training not only in the use of deadly force, but also training on how to respond to individuals who may be suicidal and/or emotionally disturbed.

51. In addition to all officers for the Town of Geneva being state certified, including, but not limited to, Officers Kirmsee, Borkhuis, Linder and Giovannoni, have complied with and exceeded mandatory training as set forth by the State of Wisconsin, which includes both in-house and out-house training and that this annual training exceeds the 24-hour mandated training required by the State of Wisconsin.

52. On October 26, 2000, at the time of the incident/shooting leading to the above-captioned lawsuit, the Town of Geneva had a written policy regarding the use of force which Officer Kirmsee and all sworn officers for the Town of Geneva had been made aware of and signed before becoming a sworn police officer for the Town of Geneva.

53. Prior to October 26, 2000, the Town of Geneva Police Department had not been involved in an incident involving the shooting of a suspect.

54. Subsequent to October 26, 2002, [sic] officers employed by the Town of Geneva have been involved in the arrest and/or detention of emotionally disturbed individual or suicidal individuals who responded in violent manners to the individual's arrest or detention. Although the controlled use of force was necessary, the arrests and/or detentions did not necessitate he [sic] use of deadly force.

55. Officer Giovannoni was the firearms instructor for the Town of Geneva and had instructed Officer Kirmsee at the firing range on October 24, 2000. Part of Officer Kirmsee's training is the use of deadly force. Once the criteria for a threat of great bodily harm were met, Officer Kirmsee was taught to shoot at the center mass or main part of the body to stop the threat. If the threat did not stop, Officer Kirmsee was to elevate that shot group to the head to eliminate that threat. Officer Kirmsee is trained to shoot more than once to stop the threat. The training includes to shoot until the threat is eliminated.

56. The Circuit Court of Walworth County, State of Wisconsin, held a jury inquest (case no. 00–CI–1). As a result of the four-day inquest, Officer Kirmsee was acquitted from any wrongdoing from his actions in this shooting. The jury found he acted in self defense.

57. Due to multiple local governmental police departments responding, the

State of Wisconsin, Division of Criminal Investigation, was summoned by the departments to investigate the shooting.

## TOWNSHIP OF LINN'S PROPOSED FINDINGS OF FACT

58. Officer James ROZENSKI was employed by the Township of Linn as a police officer on October 26, 2000.

59. Officer Edward Gritzner, III, was employed as a patrol officer for the Township of Linn on October 26, 2000.

60. Prior to the start of his work shift, Officer ROZENSKI learned that the Town of Geneva Police Department was looking for Christopher Easley and that Christopher was a potential suicidal individual.

61. While on duty as a police officer, Officer Gritzner learned that the Geneva Police Department was attempting to locate Christopher, who had been injured and had fled from his house.

62. Based upon the information Officer Rozenski had obtained (that being that Christopher was a potential suicidal individual and that the Town of Geneva Police Department was searching for Christopher), he reported to work prior to his normal starting time.

63. After hearing that the Town of Geneva Police Department was looking for Christopher, Officer Gritzner drove his squad car to the most northerly end of the Township of Linn's jurisdiction because he had learned that Christopher had fled from this residence in the Town of Geneva and Officer Gritzner had been informed that Easley's residence was relatively close to the northern end of the Township of Linn's jurisdiction.

64. Prior to October 26, 2000, Officer Rozenski had never had any police contact with Christopher, had never personally met Christopher, and had no knowledge from any source regarding Christopher's physical or mental status.

65. Officer Gritzner had never had any official contact with Christopher and while Officer Gritzner knew who Christopher was, he never had any personal contact with him, nor did Officer Gritzner have any knowledge whatsoever regarding Christopher's physical and/or mental status prior to October 26, 2000.

66. Based upon the knowledge Officer Rozenski had obtained regarding the fact that Christopher was a potential suicidal individual, he intended to drive to the intersection of Schofield Road and McDonald Road.

67. While in route to Schofield Road and McDonald Road, Officer ROZENSKI heard from radio communication that Christopher had been located in a residential subdivision known as Edgewood Hills and he immediately drove to that area.

68. Upon arriving at the intersection of Schofield Road and McDonald Road, an area which is wooded and approximately one-quarter mile from the Easley residence, Officer Gritzner parked his squad car in order to determine if he could observe Christopher and to assist other police jurisdictions who were continuing to attempt to locate and contain Christopher.

69. While parked at Schofield Road and McDonald Road, Officer Gritzner learned through police communications that Christopher had been located in Edgewood Hills Subdivision, a residential community, and Officer Gritzner immediately responded to that area.

70. After responding to Edgewood Hills Subdivision, Officer ROZENSKI parked his vehicle on Promontory Drive and Edgewood Drive and first observed Christopher, who at that time was approximately 20 yards from his location.

71. After arriving at the intersection of Promontory Drive and Edgewood

Drive in Edgewood Hills Subdivision, Officer Gritzner was able to observe Christopher who at that time was approximately 20–30 yards from his location on Promontory Drive.

72. Officer Rozenski's first observation of Christopher was that he was pacing back and forth in the middle of Promontory Drive and that he was holding a large blade knife and was cutting his wrists and throat with the knife he was holding.

73. Officer Gritzner's first observation of Christopher was that he was standing on the roadway of Promontory Drive. Christopher was shouting and was incomprehensible.

74. Officer ROZENSKI recalls Christopher continuing to pace back and forth on Promontory Drive when other police officers present directed Christopher to drop the knife he was holding. However, Christopher did not respond to these requests.

75. After observing Christopher on Promontory Drive continuing to shout and being incomprehensible, Officer Gritzner ordered Christopher, along with other officers, to drop the knife he was holding and Officer Gritzner informed Christopher he would be obtaining medical assistance for him if he wished the same.

76. Christopher's only response to the offer of assistance and request and demands made of him to drop the knife was to continue shouting incomprehensibly and to scream and he proceeded to cut himself with the knife he was holding on the wrists and throat.

77. Christopher then stopped pacing on Promontory Drive and commenced to walk in a westerly directly into a residential community that bordered Promontory Drive.

78. After observing Christopher walking into a residential community and after observing Christopher walking away from him, Officer ROZENSKI re-entered his squad car and drove in a westerly direction into the subdivision in order to contain Christopher and in an attempt to prevent Christopher from entering a large wooded area, and further, drove in a westerly direction in an attempt to provide police protection for the residents of the community in which Christopher was now walking through.

79. After observing Christopher walk in a westerly direction into a backyard of a residence, Officer Gritzner followed Christopher in an attempt to contain him and to prevent him from entering the private residence of which he was now in close proximity of.

80. As Officer ROZENSKI was driving into the subdivision he observed Christopher in the backyard of a residential home and observed him walking in the direction of an individual who was later identified as Officer Kirmsee.

81. At the time Officer ROZENSKI observed Christopher walking in the direction of Officer Kirmsee, Officer ROZENSKI was in his squad car and approximately 30 yards from Christopher.

82. As Christopher continued to walk in a westerly direction, Officer Gritzner followed him but however continued to remain 20–30 yards from him at all times.

83. As Christopher continued to walk in a westerly direction, Officer Gritzner observed Officer Kirmsee approximately 15–20 feet away from Christopher. At the time Officer Gritzner made this observation in relationship to the location of Officer Kirmsee, he was 20–30 yards away from Christopher and Officer Kirmsee was between himself and Christopher.

84. After observing Christopher walking in the direction of Officer Kirm-

see, Officer ROZENSKI stopped the vehicle he was driving and was in the process of exiting the vehicle when he heard what he believes to be four or five gunshots.

85. Immediately after hearing the gunshots, Officer ROZENSKI ran in the direction of Christopher and Officer Kirmsee to offer whatever assistance may be necessary.

86. When Officer Gritzner was approximately 20–30 yards away from Christopher he was able to overhear a brief dialog between Officer Kirmsee and Christopher wherein Officer Kirmsee directed Christopher to drop the knife he was holding. The only response Christopher gave was to ignore Officer Kirmsee's request and continued to shout and scream incoherently.

87. Officer Gritzner observed Christopher suddenly and without warning run directly in the direction of where Officer Kirmsee was located.

88. Based upon the close proximity of Christopher and Officer Kirmsee and because Officer Gritzner was 60–90 feet from Christopher, who was running directly towards Officer Kirmsee, who was between Officer Gritzner and Christopher, and based upon Christopher's sudden quick movements, Officer Gritzner did not have the opportunity to respond in any manner.

89. Officer Gritzner observed Kirmsee attempting to evade Christopher by moving in a backward direction when he heard Officer Kirmsee discharge his service weapon.

90. From the point in time when Officer Gritzner first observed Officer Kirmsee and Christopher, until Officer Gritzner observed Christopher suddenly and without warning run in the direction of Officer Kirmsee, only several seconds had passed.

91. From the point in time when Officer Gritzner was able to observe Christopher run in the direction of Officer Kirmsee, up until he heard the discharge of Officer Kirmsee's service weapon, less than five seconds had passed.

92. Prior to his employment as a sworn police officer for the Town of Linn, Officer ROZENSKI had obtained a certification from the State of Wisconsin for successfully completing all mandated state training requirements and was qualified to hold the position of a sworn police officer.

93. Prior to his employment as a sworn police officer for the Town of Linn, Officer Gritzner had obtained a certification from the State of Wisconsin for successfully completing all mandated state training requirements to hold the position of a sworn police officer.

94. Through the state certification training process, Officer ROZENSKI received state mandated training in the use of force, both deadly and non-deadly, as well as training on the continuum of force.

95. Through the state certification training he received, Officer Gritzner received state mandated training on the use of force, both deadly and non-deadly, as well as training on the continuum of force.

96. All officers employed by the Town of Linn had gone through training received during the state certification process, and in the continued annual training, all officers for the Town of Linn receive training not only in the use of deadly force, but also training on how to respond to individuals who may be suicidal and/or emotionally disturbed.

97. In addition to all officers who are employed by the Town of Linn being state certified, all officers being em-

ployed by the Town of Linn have complied with and exceeded mandatory training as set forth by the State of Wisconsin, which includes both in-house and out-house training and that this annual training exceeds the 24–hour mandated training required by the State of Wisconsin.

98. The Township of Linn has a written policy regarding the use of force.

99. No officer from the Township of Linn had been involved in any capacity with the discharge of a service weapon, other than in the capacity of animal control, since June, 1998.

100. Subsequent to June, 1998, no officer employed by the Township of Linn has been involved in the arrest and/or detention of an emotionally disturbed individual or suicidal individual who responded in any violent manner to that individual's arrest or detention and/or whose conduct necessitate the use of force, deadly or otherwise, by a responding police officer from the Township of Linn.

### CITY OF LAKE GENEVA'S PROPOSED FINDINGS OF FACT

101. Officer William W. Walser, on October 26, 2000, was a sworn police officer employed by the defendant, City of Lake Geneva Police Department, located at 626 Geneva Street, Lake Geneva, Walworth County, State of Wisconsin.

102. At approximately 10:00 p.m. on October 26, 2000, Officer Walser was on duty and was aware of a call from the Walworth County Sheriff's Department that all law enforcement agencies in the area should be on alert for a potentially suicidal individual in Geneva Township that had fled his residence on foot and was armed with a knife.

103. At approximately 11:00 p.m. Officer Walser entered the Edgewood Hills Subdivision, which was located in the City of Lake Geneva, Wisconsin.

104. After entering the subdivision, Officer Walser observed in the middle of the road, a male subject approximately 25 feet in front of his car, who was holding a knife in his right hand and was covered with blood. This person was later identified as Christopher Easley.

105. After Christopher raised his knife in the air, Officer Walser called Sergeant Michael Reuss of the City of Lake Geneva Police Department, requesting backup and informing him that he believed he located the individual who was the subject of the prior bulletin by Walworth County.

106. Officer Walser repositioned his car facing towards Christopher and activated his emergency lights. Using his loud speaker, Officer Walser ordered Christopher on the ground and to drop his knife.

107. While Christopher did get down on the ground, he refused to drop the knife.

108. Officer Walser started to approach Christopher with his gun drawn. Officer Walser drew his gun since he felt threatened by the knife that Christopher refused to drop.

109. When Officer Walser was within ten feet, Christopher jumped up and started running towards Officer Walser with the knife in the air and yelling "ROAR" as he ran.

110. Officer Walser retreated to his car and reversed his car up the hill away from Christopher.

111. Officer Walser repeatedly directed Christopher to drop the knife and get on the ground, which Christopher refused to do.

112. After Officer Walser approached Christopher a second time, Christopher

again jumped up and chased Officer Walser yelling, "DIE FUCKER".

113. Officer Walser retreated again and reversed his car further up the hill, which created more of a distance between Officer Walser and Christopher.

114. Officer Walser observed Christopher swiping the knife back and forth at his neck and wrist area but could not determine if he was actually cutting himself.

115. Shortly thereafter, back-up units arrived on the scene, which included Sergeant Reuss of the City of Lake Geneva Police Department, as well as officers from other municipalities.

116. Sergeant Reuss proceeded to the location of Officer Walser on the top of the hill while the other officers remained near the entrance of the subdivision.

117. Sergeant Reuss questioned Officer Walser whether he had less-than-lethal gun in his possession, which Officer Walser responded that he did not.

118. Christopher started running through a resident's back yard; Officer Walser and Sergeant Reuss repositioned their vehicles in an effort to contain Christopher to that area.

119. Officer Walser never touched Christopher, nor ever placed him under his control.

120. Shortly thereafter, Officer Walser heard, by radio, that shots had been fired.

121. Following the incident on October 26, 2000, Officer Walser prepared a formal report and follow-up report identifying his actions and recollections of the incident in question. These reports are a true and accurate account of Officer Walser's recollections of the incident in question.

122. On February 12 and 14, 2000, Officer Walser provided testimony at the inquest hearing investigating the death of Christopher. The testimony provided by William Walser was true and correct and was based on his report and independent recollections of the incident in question.

123. At the time of the incident, the City of Lake Geneva had in place a written policy regarding the use of force, which was followed by Officer Walser when dealing with Christopher.

124. Prior to this incident, Officer Walser had never been involved in any incident similar to that with Christopher which involved an emotionally disturbed/suicidal individual whose conduct necessitated the use of force by a responding officer.

125. Prior to the date of this incident, Officer Walser had never had any police contact with Christopher and was unaware of his prior physical or emotional problems.

126. Prior to his employment as a police officer with the City of Lake Geneva Police Department, Officer Walser completed all the necessary state mandated training and received the appropriate certification from the State of Wisconsin for the position of a sworn police officer.

127. As part of both the state certification training process, and continuing training, Officer Walser received instruction and training on the use of force, as well as how to deal with disturbed individuals. Officer William Walser also received training about the deadly threat posed by individuals who are armed with a knife.

128. Since being certified as a sworn police officer, Officer Walser has complied with and exceeded the 24–hours per year mandated continuing training set forth by the State of Wisconsin.

129. This matter was reviewed in an inquest in February of 2001 with the testimony of over 31 individuals over three days. At the completion of the

inquest, there was a finding that no wrongdoing by any of the officers involved.

## WALWORTH COUNTY'S PROPOSED FINDINGS OF FACT

130. Walworth County Sheriff's Deputies are trained principally by the State of Wisconsin, in accordance with standards developed and maintained by the Law Enforcement Standards Board of the Wisconsin Department of Justice.

131. This course of training provides instruction on all aspects of a law enforcement officer's duties and responsibilities, including the use of force, both deadly and non-deadly, the use of firearms, and contacts with emotionally disturbed persons, including the involuntary commitment of such persons under Chapter 51 of the Wisconsin Statutes.

132. Once a Walworth County Sheriff's Deputy is certified by the State, he or she must maintain that certification by completing a minimum of 24–hours of in-service training approved by the Law Enforcement Standards Board every year.

133. In addition, deputies also must complete a field training program with the Department.

134. This four-month long field training program provides officers with standardized training in the policies and procedures of the Walworth County Sheriff's Department and includes step-by-step, on-the-job training in all aspects of the Department's operations, with periodic assessments of the officers' performance.

135. As part of this field training program, deputies are required to familiarize themselves fully with the polices and procedures of the Department, including those that pertain to the use of force, both deadly and non-deadly.

136. Sergeant Roger Farnsworth and Deputies Keith Mulhollon, Robert Craig, and Jason Hintz are certified as law enforcement officers by the State, and each has maintained this certification by completing the required in-service each year.

137. Sergeant Farnsworth and Deputies Mulhollon, Craig and Hintz each completed the Department's field training program.

138. The Department maintains a special weapons and tactics ("SWAT") team for use in responding to critical incidents involving, among other things, the taking of hostages, armed or potentially armed suspects who have barricaded themselves in specific locations, and shootouts.

139. The SWAT team may only be activated by a supervisor on duty, and, once activated, the SWAT team generally requires at least 45 minutes to assemble and arrive on location.

140. Sergeant Farnsworth was working as the patrol shift supervisor on the evening of October 26, 2000. His shift was scheduled to run from approximately 2:45 p.m. to 11:15 p.m. that evening.

141. Deputies Mulhollon, Hintz, and Craig were assigned to work 3:00 p.m. to 11:00 p.m. shifts on patrol duty for the Department on October 26, 2000.

142. Prior to the events of that night, Sergeant Farnsworth and Deputies Mulhollon, Hintz, and Craig had never met Christopher, and they were not aware of any information regarding Christopher's medical or criminal history.

143. At approximately 10:00 p.m. that evening Sergeant Farnsworth and Deputies Mulhollon, Hintz, and Craig received radio transmissions informing them of a 911 call within the jurisdiction of the Town of Geneva Police Department.

144. By virtue of the radio transmissions, each was aware that the Town of Geneva Police Department was searching for a young man who had cut himself with a knife during a dispute and that the young man (who they later learned to be Christopher) had fled his residence with the knife.

145. At approximately 10:10 p.m. Sergeant Farnsworth responded to the Easley residence.

146. Upon his arrival, Sergeant Farnsworth spoke with Sergeant Sean Borkhuis of the Town of Geneva Police Department, who confirmed for Sergeant Farnsworth the information that Farnsworth had heard over the radio and, in addition, informed Farnsworth that Christopher had lost a significant amount of blood before he fled the Easley residence and was believed to be in a highly angered state.

147. Following his conversation with Sergeant Borkhuis, Sergeant Farnsworth assisted in coordinating the various law enforcement officers on the scene in their search for Christopher in the woods and grassy areas surrounding the Easley residence.

148. During the search of the area of the Easley residence, a K–9 unit from the Sheriff's Department was called in to assist, and members of the City of Lake Geneva Fire Department were also involved in the search, using thermal heat imaging devices.

149. As the highest ranking member of the Sheriff's Department on the scene, Sergeant Farnsworth's goal during the search was simply to locate Christopher to make sure that he did not do further harm to himself or to a member of the general public in the neighboring residential areas.

150. Sergeant Farnsworth did not call for the Sheriff Department's SWAT team to respond to the scene of the search because he felt the incident had not yet evolved into one involving a tactical situation requiring the team (such as a hostage taking, a shootout, or an armed person barricaded in a stationary location) and the location of Christopher was not yet known.

151. Deputy Mulhollon arrived at the Easley residence after 10:00 p.m. Upon his arrival, Mulhollon was assigned by Sergeant Farnsworth to assist the other law enforcement personnel on the scene in searching for Christopher in the woods and grassy areas surrounding the Easley residence.

152. During his search, Deputy Mulhollon observed a large amount of blood near the entryway to the home and a trail of blood leading away from the home. He also observed Christopher's mother on the scene, who was wearing bloodstained clothes at the time.

153. Deputy Hintz arrived at the Easley residence at approximately 10:10 p.m. When he first arrived, he spoke with Police Officer David Kirmsee of the Town of Geneva Police Department.

154. Officer Kirmsee informed Deputy Hintz that he had been inside the Easley residence and that Christopher had lost a lot of blood before he fled the home. Officer Kirmsee suggested that, as a result, Christopher might well have passed out in the tall grass in the neighboring fields.

155. After speaking with Officer Kirmsee, Deputy Hintz joined the other law enforcement officers on the scene in searching for Christopher in the woods and grassy areas that surround the Easley residence. During his search, he observed a number of blood trails leading away from the Easley residence.

156. Deputy Craig responded to the Easley residence. When he arrived on the scene, he spoke with Officer Kirm-

see, who verified the information Craig had first heard broadcast over the radio.

157. After speaking with Officer Kirmsee, Deputy Craig assisted in searching for Christopher in the vicinity of the Easley residence by trying to follow the blood train from the house into the grassy areas and woods that surrounded the house.

158. Shortly after 11:00 p.m., Sergeant Farnsworth received a call over his hand-held police radio indicating that an officer of the City of Lake Geneva Police Department might have located Christopher in the Edgewood Hills Subdivision in the City of Lake Geneva. Up until that time, he and the other Deputies involved in the search were still in the immediate vicinity of the Easley residence.

159. At that point, Deputy Keith Mulhollon and other law enforcement officers responded to the scene of the possible sighting to assist. Sergeant Farnsworth instructed Deputies Craig and Hintz to remain behind with him in the area of the Easley residence, however, in case the possible sighting turned out to be unfounded.

160. As a result, Sergeant Farnsworth and Deputies Craig and Hintz were still at the scene of the Easley residence when Christopher was shot in the Edgewood Hills Subdivision.

161. Deputy Mulhollon arrived at the Edgewood Hills Subdivision, which is roughly two to three miles from the Easley residence, shortly after 11:00 p.m.

162. When Deputy Mulhollon drove on to the scene, he observed Christopher standing in a residential yard at the corner of Edgewood Road and Promontory Drive.

163. Christopher was holding a kitchen knife, which he was switching back and forth between his hands, and he had blood on his hands and shirt.

164. As Deputy Mulhollon pulled up in his squad car, he could hear that Christopher was yelling at other law enforcement officers already on the scene. He could also hear the other law enforcement officers on the scene speaking to Christopher.

165. When Deputy Mulhollon pulled up, Christopher began to move across the lawn where he had been standing. Remaining in his car, Deputy Mulhollon followed Christopher along the roadway, using his spotlight to keep him in his view.

166. When Christopher moved onto a hill in an open area behind the row of houses, Deputy Mulhollon then stopped his squad car and got out of the car.

167. Deputy Mulhollon began to move towards Christopher, who was at that point approximately 100 feet away from him.

168. At that time, Deputy Mulhollon could observe Officer Kirmsee between him and Christopher. Mulhollon could hear Officer Kirmsee shouting to Christopher that he should drop the knife and stop.

169. As Deputy Mulhollon moved toward them, Christopher began moving quickly down the hill where he had been standing towards Officer Kirmsee.

170. Officer Kirmsee was backing up, continuing to shout at Christopher to drop the knife and stop.

171. Christopher ignored Officer Kirmsee's commands, continuing to move quickly at Officer Kirmsee down the hill.

172. As he moved towards Officer Kirmsee, Christopher raised the knife above his shoulder, pointing the blade of the knife at Officer Kirmsee.

173. As Christopher moved down the hill towards Officer Kirmsee with the knife, Officer Kirmsee fired his service gun at Christopher.

174. At the time Officer Kirmsee fired his gun at Christopher, Officer Kirmsee was directly between Deputy Mulhollon and Christopher.

175. At that moment, Deputy Mulhollon was still approximately 45 to 50 feet away from Christopher and Officer Kirmsee.

176. The shooting occurred no more than one to two minutes after Deputy Mulhollon initially arrived on the scene in the Edgewood Hills Subdivision.

177. Only seconds passed between the time when Christopher began to charge at Officer Kirmsee with the knife and when Officer Kirmsee fired his gun at Christopher.

178. As Christopher moved down the hill at Officer Kirmsee, Deputy Mulhollon believed that Officer Kirmsee was in immediate risk of death or grave bodily injury because of Christopher's actions.

179. Deputy Mulhollon did not fire his service weapon because Officer Kirmsee was in between him and Christopher.

180. Following the shooting, Sergeant Farnsworth transported Christopher's mother, Cynthia Easley, to the hospital. Mrs. Easley informed him that she believed that it was possible that her son, if he was upset enough, could have lunged at a law enforcement officer with the knife.

Defendants' Joint Statement of Undisputed Facts Under Local Rule 56.2(a) at ¶¶ 1–180.

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate only where "there is no genuine issue of material fact" and the movant is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). In determining whether a genuine issue of fact exists, the court examines the record as a whole, viewing all the evidence of record in the manner most favorable to the nonmovants. *See Glass v. Dachel*, 2 F.3d 733, 740 (7th Cir.1993). If the moving party meets its initial burden of showing that there is no genuine issue, then the burden shifts to the nonmovant to set forth specific facts showing the existence of a genuine issue. *See* Federal Rule of Civil Procedure 56(e). Where, as here, the party opposing summary judgment fails to respond to the facts set out by the movant, the court may assume those facts to be admitted and use them in determining whether the movant is entitled to judgment as a matter of law. *See Waldridge v. American Hoechst Corporation*, 24 F.3d 918, 922 (7th Cir.1994) (collecting cases).

The nonmovant cannot satisfy her summary judgment burden with conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. Moreover, allegations, in a complaint do not constitute evidence. *See Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir. 1991). When the nonmovant completely fails to respond,[1] then summary judgment, if appropriate, can be entered against that party. *See* Federal Rule of Civil Procedure 59(e). However, summary judgment cannot be granted merely because the opponent of the. motion fails to respond. *See Cooper v. Lane*, 969 F.2d 368, 370–71 (7th Cir.1992). Summary judgment is appropriate only if no material facts are in dis-

---

**1.** It is always prudent to respond to a motion for summary judgment, even if the opposing party believes that the movants have failed to

sustain their initial burden. *See Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984).

pute and the moving parties are entitled to prevail as a matter of law. *See Tobey v. Extel/JWP, Inc.,* 985 F.2d 330, 332 (7th Cir.1993); *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir. 1984); *Thornton v. Evans,* 692 F.2d 1064, 1075 (7th Cir.1982).

## III. *DISCUSSION AND DECISION*

### A. FEDERAL CLAIMS

#### 1. *Eighth Amendment and Due Process*

In the Complaint, the Plaintiff claims that her decedent was subjected to "cruel and unusual punishment as secured ... under the Eighth Amendment to the United States Constitution, and of his right not to be deprived of life, liberty, or property without due process of law ...." Complaint at Law at ¶ 22. In moving for summary judgment, the Defendants argue that, because Easley was not a prisoner at the time of his seizure and death, the Eighth Amendment does not apply.

■ At the time the Plaintiff claims that Christopher Easley's rights were violated, police officers were attempting to seize or arrest him. Because Christopher was not a convicted state prisoner, the Eighth Amendment's prohibition on cruel and unusual punishment does not apply to him. *See Estate of Cole by Pardue v. Fromm,* 94 F.3d 254, 259 n. 1 (7th Cir.1996), *cert. denied,* 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997).

■ Similarly, the Due Process Clause of the Fourteenth Amendment applies only to rights of a pretrial detainee. *See Id.* Because Christopher Easley was not a pretrial detainee, a claimed violation of the Due Process Clause cannot afford the Plaintiff relief.

The United States Supreme Court has ruled that "all claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard ...." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Therefore, because there is no legal basis for the Plaintiff's Eighth Amendment and Due Process Clause claims, summary judgment in favor of the Defendants will be granted on them.

#### 2. *Equal Protection*

■ The Complaint also contains a claim that the Plaintiff was deprived of equal protection. The Defendants have challenged this claim by speculating that it is the same cause of action the Plaintiff tried to assert under the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213. *See* Order of October 2, 2002. *See also Hainze v. Richards,* 207 F.3d 795, 801–02 (5th Cir.), *cert. denied,* 531 U.S. 959, 121 S.Ct. 384, 148 L.Ed.2d 296 (2000) (Title II of the Americans With Disabilities Act prohibiting discrimination on the basis of disability by public entities and requiring reasonable accommodation of disabled person's limitations does not apply to officer's on-the-street response to a disturbance, whether or not the disturbance involves a person with a disability, prior to the officer's securing the scene and ensuring that there is no threat to human life).

The ADA claim was rejected in denying the Plaintiff's motion to amend the Complaint. *See* Order of October 2, 2002. In response to the instant summary judgment motions, the Plaintiff has presented no specific facts or arguments supporting the claim. Therefore, the court deems the claim waived.

#### 3. *Fourth Amendment*

##### a. Municipal Liability

■ In the Complaint, the Plaintiff alleges that:

Defendants Lake Geneva, Geneva Township, Linn Township and Walworth

County were responsible for the training of all members of their respective police forces in the proper use of firearms in the performance of their duties and in their confrontation with disturbed individuals and failed to do so.

Complaint at Law at ¶ 21. The Plaintiff says that the municipalities had a "duty to hire and train persons qualified and trained to properly subdue such persons [as Christopher Easley] while inflicting the least harm possible, and stopping short of shooting such individuals to death. Such guidelines did or should have included training in non-fatal restraint of mentally ill and/or suicidal persons involving, among other things, the use of family members, psychiatric facilitators, rubber bullets, nets, bean bag, night stick, pepper spray, tear gas, and/or non-fatal gunshots." *Id.* at ¶ 33.

The four municipal Defendants, Lake Geneva, Geneva Township, Linn Township, and Walworth County, have moved for summary judgment on this failure to train claim on the ground that the Plaintiff cannot prove the essential elements of a municipal liability claim which were set forth in *Monell v. New York Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In that case the United States Supreme Court held that a municipality may be held liable for violating the civil rights of a person only if the injury is inflicted pursuant to an unconstitutional policy or custom.

The Seventh Circuit has explained the general requirement for establishing municipal liability as follows:

Strict constraints limit municipal liability under 42 U.S.C. § 1983. In *Monell v. Dep't of Soc. Serv. of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), the Supreme court expressly restricted such liability to cases in which "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." A plaintiff seeking to find a municipality liable under § 1983 must establish a causal nexus between his injury and the municipality's alleged policy or custom. *Id.* at 693–94, 98 S.Ct. at 2037–38. "Otherwise, we would risk creating de facto respondeat superior liability, which is contrary to *Monell.*" *Cornfield By Lewis v. Consolidated High School Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir.1993) (citing *Monell,* 436 U.S. at 693–94, 98 S.Ct. at 2037–38).

*Palmquist v. Selvik,* 111 F.3d 1332, 1343–44 (7th Cir.1997).

The Seventh Circuit has also explained the requirements for a failure to train claim:

In *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court reiterated that a municipality may, in restricted circumstances, be held liable under § 1983 for constitutional violations resulting from its failure to train its police officers. *Id.* at 387, 109 S.Ct. at 1203–04. But the Court well circumscribed its holding: "The inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1204 (footnote omitted). "Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury .... To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983." *Id.* at 391, 109 S.Ct. at 1206.

Thus, "[a]n allegation of 'failure to train' is available only in limited circum-

stances." *Cornfield*, 991 F.2d at 1327. To prevail on such a claim, the estate had to show that Bensenville failed to train its police officers in a "relevant respect," and that the failure to train evidences a deliberate indifference to its citizens' rights. *Id.* (citing *City of Canton*, 489 U.S. at 389, 109 S.Ct. at 1205). In *City of Canton*, the Supreme Court elucidated this standard:

> Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983. Monell's rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.... [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it causes injury.

*Id.* at 389–90, 109 S.Ct. at 1205 (footnotes omitted). In *Cornfield*, this court added to this understanding:

> In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or

training program, we require a high degree of culpability on the part of the policymaker. Coupled with a causation requirement, this standard ensures that the violation alleged is not too far removed from the policy or training challenged as inadequate. Taken together, these two considerations amount to a requirement that liability be based on a finding that the policymakers have actual or constructive notice that a particular omission that is likely to result in constitutional violations.

991 F.2d at 1327.

*Palmquist v. Selvik*, 111 F.3d at 1344.

In this case the Defendants have submitted affidavits and other evidence showing that the individual officers from the municipalities received training in the use of force. *See* Defendant's Joint Statement of Undisputed Facts Under Local Rule 56.2(a) at ¶¶ 48, 49, 50, 51, 52, 55, 92, 93, 94, 95, 96, 97, 98, 126, 127, 128, 130, 131, 132, 133, 134, 135, 136, 137, 138 and 139 and evidence in the record cited therein. By failing to respond to the summary judgment motions, the Plaintiff has introduced nothing into the record to show that she can prove that the training was inadequate. Therefore, because the Plaintiff has failed to raise any issue of fact as to whether the municipalities failed to train its law enforcement officers in a relevant respect, the Plaintiff's claims against the municipalities fail and summary judgment will be granted in their favor.

b. Individual Liability

■ The law enforcement Defendants, in their individual capacities, have all moved for judgment on the ground that they are entitled to qualified immunity.[2]

---

**2.** The Plaintiff has not specified whether the individual Defendants are being sued in their official or personal capacities. If they are being sued in their official capacities, the

claims are governed by the same legal principles as the claims against the municipalities and are dismissed on the same grounds. See *Sanville v. McCaughtry*, 266 F.3d 724, 732

The United States Supreme Court has held that: "[G]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

Recently, the Seventh Circuit described the considerations to be made when qualified immunity is invoked in defending against a Fourth Amendment claim:

> The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If a violation can be made out based on the plaintiff's allegations, a court should then inquire as to whether the right was clearly established. *See Id.* As the Court explained in *Saucier,* qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151. Thus, for a constitutional right to be clearly established, "its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of preexisting law the unlawfulness must be apparent.'" *See Hope v. Pelzer,* —— U.S. ——, ——, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (internal quotations and citations omitted). Accordingly, in this case we must first determine if, assuming the facts alleged

in the complaint are true, Officer Muldrow violated the plaintiffs' Fourth Amendment rights by threatening him with arrest if he did not leave the premises, and if Chief Lymore violated the plaintiffs' rights by failing to intervene in the situation. If so, we must then determine whether the state of the law at the time of the alleged events at issue gave them a fair warning that their treatment of the plaintiffs was unconstitutional. *See Id.* The plaintiffs bear the burden of establishing the existence of a clearly established constitutional right. *See Rakovich v. Wade,* 850 F.2d 1180, 1209 (7th Cir.1988).

> The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Its "central requirement" is one of reasonableness. *See Texas v. Brown,* 460 U.S. 730, 739, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Therefore, to state a constitutional violation, the defendants must allege (1) Officer Muldrow's conduct constituted a "seizure," and (2) the seizure, if one occurred, was "unreasonable." *Kernats v. O'Sullivan,* 35 F.3d 1171, 1177 (7th Cir.1994); *Donovan v. City of Milwaukee,* 17 F.3d 944, 948 (7th Cir.1994).

*White v. City of Markham,* 310 F.3d 989 (7th Cir.2002).

◼ Following the Seventh Circuit's analytical scheme, the court must first determine whether the Plaintiff's allegations, if true, establish a constitutional violation. In the Complaint, the Plaintiff claims that Officer Kirmsee was unjustified in shooting and killing Christopher Easley and that the other officers should have intervened to prevent the killing. Law enforce-

---

(7th Cir.2001). If the Defendants are being sued in their individual capacities, they are

entitled to invoke the defense of qualified immunity. *See Id.*

ment officers do not violate the Fourth Amendment if the force used during a seizure is objectively reasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." See *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Assuming for purposes of this motion that Christopher Easley was "seized" at the time of the alleged violations of his rights, the court must evaluate the seizure and attendant use of force by examining the totality of the circumstances. See, e.g., *Illinois v. McArthur*, 531 U.S. 326, 331–34, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). The undisputed facts in the record show that the Defendant officers were dispatched to search for Christopher Easley, who had left his home in a rage, inebriated, spattered with blood from self-inflicted cuts, and armed with a knife. As the officers closed in on him, he refused to relinquish the knife and began to charge Officer Kirmsee. Officer Kirmsee, fearing for his life, shot and killed Christopher. *See* Defendants' Joint Statement of Undisputed Facts Under Local Rule 56.2(a). He says that he did not use spray or his baton or any other lesser force because of the immediate threat to his life. *See* Affidavit of Officer David Kirmsee at ¶ 27.

Given these undisputed facts, the force used against Christopher Easley was reasonable and the officers did not violate the Plaintiff's Fourth Amendment rights. As a result, the officers are entitled to qualified immunity from suit in their individual capacities.

## B. SUPPLEMENTAL CLAIMS

Having disposed of the Plaintiff's federal claims, the court will dismiss the Plaintiff's state claims for battery, breach of the duty to hire, train and supervise, and wrongful death. *See* 28 U.S.C. / 1367. The rulings on the federal claims are not necessarily dispositive of the state law claims in that the elements of the claims are not necessarily dispositive of the state law claims in that the elements of the claims are different; and, considerations of judicial efficiency do not warrant exercising jurisdiction over these claims. *See Miller Aviation v. Milwaukee County Board of Supervisors*, 273 F.3d 722, 731 (7th Cir.2001).

## *ORDER*

For the reasons explained above, the court ORDERS that the " Defendants, Town of Geneva, David Kirmsee, Sean Borkuis and Robert Linder's Motion for Summary Judgment" (filed August 13, 2002) IS GRANTED.

IT IS FURTHER ORDERED that the "Motion for Summary Judgment" (filed August 14, 2002 by Defendants Edward Gritzner, III, James Rozenski and Linn Township) IS GRANTED.

IT IS FURTHER ORDERED that "William W. Walser and the City of Lake Geneva's Motion Pursuant to F.R.C.P. 56" (filed August 15, 2002) IS GRANTED.

IT IS FURTHER ORDERED that the "Motion for Summary Judgment of Defendants Walworth County, Keith Mulhollon, Roger Farnsworth, Robert Craig, and Jason Hintz" (filed August 15, 2002) IS GRANTED.

IT IS FURTHER ORDERED that this action is dismissed. The federal claims are dismissed upon their merits and with prejudice and the supplemental claims are dismissed without prejudice.

IT IS FURTHER ORDERED that the Clerk of Court shall enter a final judgment as a separate document. *See* Federal Rule of Civil Procedure 58. This judgment shall provide that:

This action came on for hearing before the court, the Honorable Thomas J. Cur-

ran, District Judge, presiding, and the issues having been heard and a decision having been rendered

IT IS ORDERED AND ADJUDGED that the Plaintiff Cynthia Easley, Individually and as Administrator of the Estate of Christopher B. Easley, deceased, take nothing and that this action is dismissed and that the Defendants David Kirmsee, Edward Gritzner III, Robert Linder, Keith Mulhollon, William W. Walser, Sean Borkhuis, Sgt. Farnsworth, Robert Craig, Jason Hinz, James Rozenski, Lake Geneva, Geneva Township, Linn Township, and Walworth County recover of the Plaintiff their costs of this action.